**KIRBY McINERNEY LLP**
Robert J. Gralewski, Jr. (#196410)
600 B Street, Suite 2110
San Diego, California 92101
Telephone: (619) 784-1442
Email: bgrawleski@kmllp.com

Ira M. Press
Daniel Hume
Thomas W. Elrod
Meghan J. Summers
250 Park Avenue, Suite 820
New York, New York 10117
Telephone: (212) 371-6600
Email: ipress@kmllp.com
        dhume@kmllp.com
        telrod@kmllp.com
        msummers@kmllp.com

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KINGSTOWN PARTNERS MASTER LTD., KINGSTOWN PARTNERS II, LP, KTOWN, LP, and KINGFISHERS, LP<br><br>Plaintiff,<br><br>v.<br><br>DXC TECHNOLOGY COMPANY, HEWLETT PACKARD ENTERPRISE COMPANY, RISHI VARNA, TIMOTHY C. STONESIFER, JEREMY K. COX, MUKESH AGHI, AMY E. ALVING, DAVID HERZOG, SACHIN LAWANDE, J. MICHAEL LAWRIE, JULIO A. PORTALATIN, PETER RUTLAND, MANOJ P. SINGH, MARGARET C. WHITMAN, ROBERT F. WOODS, and PAUL N. SALEH,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

**TABLE OF CONTENTS**

I.      INTRODUCTION.................................................................................................. 1

II.    JURISDICTION AND VENUE ......................................................................... 7

III.   PARTIES .......................................................................................................... 8

     A.    Plaintiffs ................................................................................................. 8

     B.    Defendants ............................................................................................. 8

IV.   SECURITIES ACT ALLEGATIONS................................................................10

     A.    DXC's Business and History...................................................................10

     B.    The Merger and Issuance of DXC Shares................................................11

     C.    Misrepresentation of DXC's Workforce Optimization Plan....................12

     D.    DXC's Extreme Workforce Reduction Plan ...........................................13

           1.    The Hilton Complaint..................................................................13

           2.    CSC's Pre-Merger Cuts................................................................13

           3.    DXC's Harmful Implementation of Its Extreme Workforce
                Reduction Plan.............................................................................14

     E.    The Disastrous Impact of the Extreme Workforce Reduction Plan .........17

V.    THE SECURITIES ACT DEFENDANTS' ACTIONABLE MISREPRESENTATIONS
     AND OMISSIONS IN DXC'S REGISTRATION STATEMENT ....................................21

     A.    Material Misrepresentations....................................................................21

     B.    Failure to Make Required Disclosures.....................................................23

           1.    Disclosure Obligations Under the Securities Act .........................23

           2.    Item 303 Disclosure Requirements...............................................24

           3.    Item 503 Disclosure Requirements...............................................25

VI.   CLAIMS BROUGHT PURSUANT TO THE SECURITIES ACT ....................28

VII.  EXCHANGE ACT ALLEGATIONS.................................................................30

VIII. THE EXCHANGE ACT DEFENDANTS' ACTIONABLE MISREPRESENTATIONS
     AND OMISSIONS..........................................................................................31

     A.    Material Misrepresentations in the Registration Statement .....................31

     B.    The Exchange Act Defendants' False and Misleading Statements and
            Omissions Concerning DXC's Revenue Growth .....................................33

| | | | |
|---|---|---|---|
| | 1. | The Fiscal Year 2018 Guidance | 33 |
| | 2. | The Fiscal Year 2019 Guidance | 36 |
| | 3. | Other False and Misleading Statements Concerning DXC's Revenue | 38 |
| C. | | The Exchange Act Defendants' False and Misleading Statements and Omissions Concerning DXC's Workforce Management and "Optimization" | 40 |
| D. | | The Exchange Act Defendants' False and Misleading Statements and Omissions Concerning DXC's "Investment in People" | 47 |
| E. | | The Exchange Act Defendants' False and Misleading Statements and Omissions Concerning DXC's Digital Growth | 53 |
| F. | | The Exchange Act Defendants Overstated the Value of the Company's Largest Asset | 54 |
| IX. | | THE TRUTH EMERGES | 56 |
| A. | | The Truth Emerges as the Exchange Act Defendants Reveal an Enormous Revenue Shortfall and Issue Revised Guidance Showing Decline, Not Growth | 56 |
| | 1. | The October 24, 2018 Corrective Disclosure | 56 |
| | 2. | The November 6, 2018 Corrective Disclosure | 58 |
| | 3. | The August 8, 2019 Corrective Disclosure | 61 |
| X. | | SCIENTER ALLEGATIONS | 63 |
| A. | | DXC's Former Head of Global Delivery Exposes the Exchange Act Defendants' Deception | 63 |
| | 1. | CSC's Pre-Merger Cuts | 65 |
| | 2. | DXC's Harmful Implementation of Its Extreme Workforce Reduction Plan | 65 |
| B. | | Former Employees Corroborate that the Exchange Act Defendants Made "Chaotic" and "Sub-Optimal" Firing Decisions | 69 |
| C. | | The Exchange Act Defendants Personally Learned about "Negative Impacts on Customer Satisfaction" from Their Workforce Reductions | 73 |
| D. | | The Exchange Act Defendants Knew that They Could Not Bring on the Resources Needed to Support Their Promised Growth | 75 |
| E. | | The Exchange Act Defendants Had Access to, and Knowledge of, Information Undermining Their Projections and Revenue Guidance | 78 |
| F. | | The Exchange Act Defendants Classified "Digital" Offerings to Manipulate the Market | 80 |
| G. | | The Individual Exchange Act Defendants Had a Motive to Commit Fraud | 82 |

XI.  PRESUMPTION OF RELIANCE ................................................................84

XII.  INAPPLICABILITY OF STATUTORY SAFE HARBOR ..............................85

XIII.  CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT .....................85

XIV.  PRAYER FOR RELIEF .........................................................................87

XV.  JURY DEMAND ................................................................................87

Plaintiffs Kingstown Partners Master Ltd., Kingstown Partners II, LP, Ktown, LP, and Kingfishers, LP (collectively, "Plaintiffs"), by and through their attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys. Such investigation included, among other things, a review of Defendants' public statements and announcements, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding DXC Technology Company, securities analysts' reports, news stories, and the documents filed in *Hilton v. DXC Technology Company*, No. 1:19-cv-01157-PKC (S.D.N.Y.) (the "*Hilton* Action"), *In re DXC Technology Company Securities Litigation*, No. 1:18-cv-01599-AJT-MSN (E.D. Va.) (the "*In re DXC* Class Action"), and *Costanzo v. DXC Technology Company*, No. 5:19-cv-05794-BLF (N.D. Cal.) (the "*Costanzo* Action"). Plaintiffs believe that additional substantial evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

## I.      INTRODUCTION

1.      Plaintiffs bring this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, and Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

2.      DXC Technology Company ("DXC or the "Company") is an information technology ("IT") company that began trading on the New York Stock Exchange ("NYSE") on April 3, 2017. The Company was formed in April 2017, when Hewlett Packard Enterprise Company ("HPE") spun off one of its five business segments, the Enterprise Services segment, and merged it with Computer Sciences Corporation, Inc. ("CSC") to form the company known as DXC (the "Merger"). During the period from March 31, 2017 through August 9, 2019 (the "Relevant Period") Plaintiffs acquired shares of DXC securities at prices that were artificially inflated as a result of Defendants' violations of the securities laws.

3.      The Securities Act Defendants (defined in ¶ 43 below) issued the prospectus and registration statement (the "Registration Statement") to solicit investors to purchase DXC shares and to convince CSC shareholders to vote in favor of the Merger, pursuant to which they would exchange

their CSC shares for DXC shares. The Registration Statement touted the more than $1 billion in synergies that DXC would achieve in the first year after the Merger due to a "workforce optimization" plan. This plan purportedly involved the "elimination of duplicative roles and other duplicative general, administrative and overhead costs" and would "align [DXC's] costs with its revenue trajectory." In addition, the Registration Statement highlighted the size, breadth, and experience of DXC's workforce, as well as the newly formed Company's ability to optimize its workforce through improved hiring and retention practices.

4.     These and similar representations in the Registration Statement were materially false and misleading when made because the Securities Act Defendants failed to disclose to investors that: (a) the so-called "workforce optimization" plan actually involved crippling DXC's workforce infrastructure; (b) DXC planned to jettison tens of thousands of employees, including some of its most highly skilled and longest-tenured employees, on a precipitous timeline; (c) these workforce reductions were made to inflate reported earnings and other financial metrics in the short-term at the expense of client service delivery; (d) DXC planned $2.7 billion of cost reductions in the first year, nearly double the $1.5 billion run rate savings target that was made public; (e) as a result of these workforce reductions, DXC materially hampered its ability to deliver on client contracts, endangering longer-term revenue growth; (f) internally, senior executives had voiced concerns that targeted reductions would be unachievable without causing massive damage to the Company's customer relationships; and (g) the aggressive personnel cuts seriously harmed DXC's ability to attract and retain high-quality personnel, further undermining client service delivery.

5.     Instead of a rational, measured workforce optimization process designed to eliminate duplication and align costs with revenue, as represented in the Registration Statement, at the time of the Merger, DXC had already planned a dramatic and accelerated workforce reduction at a scale much larger than what was indicated to investors. This plan involved major undisclosed risks that the cuts to DXC's workforce would be too large, too soon, resulting in client dissatisfaction and the departure of key employees, which, consequently, would materially harm DXC's ability to secure and generate revenue on new or renewed contracts. Pursuant to Items 303 and 503 of SEC Regulation

S-K, the Registration Statement was required to disclose these specific risks and uncertainties. Defendants failed to do so.

6.     Throughout the Relevant Period, the Exchange Act Defendants (defined in ¶ 44 below) engaged in a ruthless cost-cutting and "workforce optimization" strategy despite having been repeatedly warned, including by their most senior management, that their chaotic cuts to the Company's workforce and facilities were resulting in extreme customer dissatisfaction, the departure of key employees, and impeding the Company's ability to secure and generate revenue on new contracts. Because confronting these facts contradicted the growth thesis that the Exchange Act Defendants had sold to the market, the Exchange Act Defendants ignored these red flags and instead chose to deliberately mislead investors about the purported success of their reorganization efforts—artificially inflating DXC's stock price and reaping tens of millions of dollars in insider stock sales and unwarranted performance-based compensation awards for themselves.

7.     On multiple occasions during the Relevant Period, the Exchange Act Defendants made positive statements about DXC's staffing and customer satisfaction. Defendant Lawrie, for example, repeatedly stated that DXC had "improved service levels for our clients," and that the Company's reorganization efforts were having "an enormously positive impact on our business." He particularly highlighted supposed increases in "customer satisfaction" and on multiple occasions represented that the Company was performing well on its current client contracts "while staffing the required labor for new business." Defendants also continuously emphasized that they were investing heavily in training their "critical" workforce.

8.     Along with these statements, the Exchange Act Defendants provided positive revenue and other guidance to the market. For example, on May 24, 2018, Defendants Lawrie and Saleh told the market to expect $21.5 billion to $22 billion in revenue for fiscal 2019—guidance indicating that the Exchange Act Defendants' transformative plan was working and had managed to moderate and perhaps even turn around legacy IT industry trends. They reiterated this guidance on August 7, 2018, and again a week later during the Company's annual shareholder meeting. During that meeting, they again stated that DXC was "providing unsurpassed value for [its] clients."

9.       In late August 2018, reports began to surface in trade publications that all was  not well behind the scenes at DXC. An August 17, 2018 article in *The Register* reported that employees at DXC had stated that the Company was struggling to perform its client contracts because of the massive workforce reductions. The Exchange Act Defendants attempted to quash those reports, holding a series of meetings with analysts covering DXC and assuring those analysts that the Company's clients were satisfied and the Company was well positioned for sustained growth. This effort had the desired effect, ensuring that DXC's stock price did not fall as analysts issued positive reports in early September 2018.

10.       At that same time, the Individual Exchange Act Defendants took advantage of DXC's inflated stock price to enrich themselves through tens of millions of dollars in insider sales. For instance, during the eight-month period prior to the partial corrective disclosure of October 2018, Defendant Lawrie sold 110,540 shares of DXC stock—more than 17% of his holdings—for personal proceeds of more than ***$10 million***. Defendant Saleh, in turn, sold a staggering ***seventy-seven percent*** of his personal holdings for more than $9 million in proceeds during the same period. All of these sales were made at the same time that these Defendants were making aggressively positive statements to the market regarding the supposed success of DXC's reorganization efforts.

11.       Unfortunately for investors, the reality inside DXC stood in stark contrast to the Exchange Act Defendants' rosy public statements. As Defendants Lawrie and Saleh knew, in their efforts to reduce costs in order to report seemingly strong short-term financial performance, they had caused DXC to make such drastic workforce reductions that the Company was becoming unable to deliver on its client contracts and client dissatisfaction was running at an all-time high. Numerous former employees of DXC have stated that the so-called "workforce optimization" the Exchange Act Defendants had enacted was, in reality, little more than earnings management in disguise—a system of arbitrary quotas that fired workers by the tens of thousands and was selectively timed to present the most favorable quarterly and yearly financial reports. As detailed below, according to the Consolidated Class Action Complaint (the "CAC") filed in the *In re DXC* Class Action, former employees have explained that these cuts were made with no real plan other than to improve the

Company's short-term results and targeted knowledgeable, longer-tenured (and thus more expensive) senior personnel.

12.     There can be no question that the Exchange Act Defendants knew their public assurances about the success of DXC's reorganization efforts and long-term business prospects were false. DXC's most senior executives expressly told the Exchange Act Defendants about the severe issues behind the scenes. The workforce reductions fell most heavily on the largest of the Company's three divisions, referred to as "Global Delivery," which included the tens of thousands of employees who were tasked with actually performing the contracts DXC had with its clients.

13.     Executive Vice President Stephen J. Hilton ("Hilton") was the head of Global Delivery, one of DXC's three main operating divisions (the others being "Sell" and "Build"). Global Delivery was the division that housed the Company's IT personnel who served clients in the field. Because most of DXC's personnel were located in Global Delivery, most of the Company's workforce cuts were to occur within that division. As alleged in a complaint that he filed against DXC, Hilton warned that "[p]recipitous cuts in Global Delivery could be disastrous for DXC's long-term revenue, because those cuts would have a direct impact on customer satisfaction, a point routinely expressed to Hilton by his 'Sell' and 'Build' peers." Hilton stated that the plan for $2.7 billion in cuts in Global Delivery would entail having "to fire far more people far more quickly, with the resulting negative impact on customer satisfaction." He "repeatedly advised [Defendant Chief Executive Officer J. Michael Lawrie ("Lawrie")] about his reservations concerning the pace of cuts."

14.     The Hilton Complaint also attaches an internal letter written by Defendant Lawrie himself on May 15, 2018. In this letter, Lawrie says that Hilton had failed to achieve the required cost-cuts and imperiled DXC relationships, and accuses Hilton of "material misconduct" and a "substantial and willful failure to render services."

15.     Defendants concealed these shocking developments from the public. To the contrary, less than ten days after writing his alarming letter to Hilton, Lawrie spoke to investors on the Company's earnings call for the conclusion of its first fiscal year and disclosed not a hint of the failures he claimed were occurring in Hilton's division. To the contrary, he bragged that the Exchange Act Defendants had "really successfully completed the overall year 1 integration road

map," had "***track[ed] a bit ahead of plan on revenue***," and "profit was . . . ***better than expected*** as we were able to ***accelerate many of the cost takeout synergies***[.]" Indeed, as for Hilton's division, Lawrie told investors that "our delivery teams continued to drive increased productivity while improving service levels for our clients."

16.    These public statements cannot be squared with Defendant Lawrie's internal letter to Hilton. Nor can they be squared with information obtained from multiple former employees whose statements and accounts are set forth in the CAC filed in the *In re DXC* Class Action. As described in more detail below, some of these former employees note that throughout the Relevant Period, "Global Delivery" was on "pins and needles" because they simply did not have enough skilled employees to execute on their customer contracts. As experienced and essential employees were forced out, the problem only worsened and clients expressed enormous frustration with the Company. According to the CAC, numerous former employees noted that Lawrie knew (but did not care) that his workforce reductions "could not be achieved at the pace required by his internal budget" and the Company was struggling to keep customers satisfied and marshal the resources to generate revenue from new contracts.

17.    On October 24, 2018, the truth began to emerge when *The Register* published another article reporting that DXC had fired a senior executive named Karan Puri ("Puri"). Puri had been hired just months before, with Lawrie describing him as a "top-notch senior IT services business leader." The article quoted insiders at DXC who stated that the Company was "***descending into turmoil***" and that in early October Lawrie had called a "town hall" meeting where he announced additional firings and blamed Puri for a "***10-15 percent shortfall in [forecast] revenues***." This news caused DXC's stock price to decline by more than 16%, from $87.56 per share to $73.25 per share.

18.    The Company responded by filing a Form 8-K "in response to today's movement in the stock of DXC" that reiterated the Company's previous EPS guidance. On November 6, 2018, DXC filed another Form 8-K, which reported the Company's second quarter fiscal year 2019 earnings. This Form 8-K disclosed that the Company had in fact—as Defendant Lawrie had been warned internally—suffered a disastrous 8% decline in year-over-year revenue, with a revenue

1   shortfall of more than $440 million. As a result, DXC's stock price dropped over 12%, from $72.21

2   per share to $63.21 per share, on extremely high trading volume.

3       19.    The October and November 2018 revelations rocked the investment community and

4   caused material declines in DXC's share price, but unbeknownst to Plaintiff and other investors, the

5   full extent of the devastation had yet to be revealed, and therefore the artificial inflation had yet to

6   be fully removed from DXC's share price. The true extent of the Company's shortfall was revealed

7   on August 8, 2019, after the market closed, when the Company lowered its fiscal 2020 guidance,

8   expecting revenue between $20.2 billion and $20.7 billion, representing a $500 million shortfall from

9   the already disappointing previously-issued guidance. On this news, the Company's share price fell

10  $15.74, or over 30%, to close at $35.91 per share on August 9, 2019, on unusually heavy trading

11  volume.

12  **II.    JURISDICTION AND VENUE**

13      20.    The claims asserted herein arise under Sections 11 and 15 of the Securities Act, 15

14  U.S.C. §§ 77k and 77o, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and

15  78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

16      21.    This Court has jurisdiction over the subject matter of this action pursuant to Section

17  22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28

18  U.S.C. §§ 1331 and 1337.

19      22.    Venue is also proper in this District under Section 22 of the Securities Act, 15 U.S.C.

20  § 77v(a) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a), which provide that any suit under

21  the Securities Act and Exchange Act, respectively, may be brought "in the district wherein the

22  defendant is found or is an inhabitant or transacts business[.]" Many of the violations of law alleged

23  herein occurred in this District, including the dissemination of the material misrepresentations and

24  omissions complained of herein and the sale of DXC shares by Defendants into this District.

25  Additionally, each of the Defendants also has sufficient contacts with this District, or otherwise

26  purposefully availed himself or itself of benefits of this District, so as to render the exercise of

27  jurisdiction over each by this District consistent with traditional notions of fair play and substantial

28

1    justice. For instance, Defendants HPE and Jeremy K. Cox are located or reside in this District, and

2    many of the witnesses and documents relevant to this litigation can be found in this District.

3        23.    In connection with the acts alleged in this Complaint, Defendants, directly or

4    indirectly, used the means and instrumentalities of interstate commerce, including the mails,

5    interstate telephone communications, and the facilities of the national securities markets.

6    **III.    PARTIES**

7        **A.    Plaintiffs**

8        24.    Plaintiff Kingstown Partners Master Ltd. is a Cayman Islands exempted company. It

9    is managed and advised by Kingstown Capital Management, L.P. ("Kingstown Capital").

10       25.    Plaintiffs Kingstown Partners II, LP; Ktown, LP; and Kingfishers, LP are Delaware

11   Limited Partnerships. They are managed and advised by Kingstown Capital. Collectively, the

12   individual plaintiffs are referred to as "Plaintiffs".

13       26.    Plaintiffs acquired DXC shares at artificially inflated prices during the Relevant

14   Period, including (a) former HPE shares that were converted to DXC shares in the Merger, (b) DXC

15   shares that were issued in exchange for CSC shares pursuant to the Registration Statement, and (c)

16   DXC shares that were purchased post-Merger on the NYSE.

17       **B.    Defendants**

18       27.    DXC is an information technology company that services private and public-sector

19   enterprises and is incorporated in the state of Nevada. Headquartered in Tysons, Virginia, the

20   Company maintains offices around the world, including offices in Northern California. DXC's

21   common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "DXC."

22       28.    HPE is an information technology company based in Northern California. Before the

23   Merger, HPE was the sole controlling shareholder of DXC. After the Merger, HPE shareholders held

24   a controlling majority (approximately 50.1%) of the outstanding common shares of DXC. HPE

25   exercised its control over DXC and the Merger by designating HPE employee representatives as

26   officers and directors of DXC who, within the scope of their employment with HPE, reviewed,

27   contributed to, signed, or agreed to be named as incoming officer and director designees in the

28   Registration Statement.

29.     Rishi Varma ("Varma") was an employee and General Counsel of HPE at the time of the Merger. In his capacity as an employee representative of HPE, he served as President, Secretary, Principal Executive Officer, and a director of DXC until the Merger's completion, at which time he was replaced by J. Michael Lawrie. Varma signed the Registration Statement.

30.     Timothy C. Stonesifer ("Stonesifer") was the Chief Financial Officer ("CFO") of HPE at the time of the Merger. In his capacity as an employee representative of HPE, he served as CFO and a director of DXC until the Merger's completion, at which time he was replaced as CFO by Paul N. Saleh. Stonesifer signed the Registration Statement.

31.     Jeremy K. Cox served as a director of DXC until the Merger's completion and signed the Registration Statement.

32.     Mukesh Aghi is named in the Registration Statement as an incoming DXC director. He reviewed and contributed to the Registration Statement.

33.     Amy E. Alving is named in the Registration Statement as an incoming DXC director. She reviewed and contributed to the Registration Statement.

34.     David Herzog is named in the Registration Statement as an incoming DXC director. He reviewed and contributed to the Registration Statement.

35.     Sachin Lawande is named in the Registration Statement as an incoming DXC director. He reviewed and contributed to the Registration Statement.

36.     J. Michael Lawrie is named in the Registration Statement as the incoming Chairman of the DXC Board, as well as the incoming President and Chief Executive Officer ("CEO") of DXC. He is the former President and CEO of CSC. DXC announced Lawrie's retirement as CEO of the Company in September 2019. He reviewed and contributed to the Registration Statement.

37.     Julio A. Portalatin is named in the Registration Statement as an incoming DXC director. He reviewed and contributed to the Registration Statement.

38.     Peter Rutland is named in the Registration Statement as an incoming DXC director. He reviewed and contributed to the Registration Statement.

39.     Manoj P. Singh is named in the Registration Statement as an incoming DXC director. He reviewed and contributed to the Registration Statement.

40.     Margaret C. Whitman is named in the Registration Statement as an incoming DXC director. At the time of the Merger, she was the President and CEO of HPE. In her capacity as CEO and employee representative of HPE, she reviewed, contributed to, and was named as an incoming DXC director in the Registration Statement.

41.     Robert F. Woods is named in the Registration Statement as an incoming DXC director. He reviewed and contributed to the Registration Statement.

42.     Paul N. Saleh ("Saleh") has served as Executive Vice President and CFO of DXC since April 1, 2017. Prior to starting at DXC, Saleh served as CFO of CSC, beginning on May 23, 2012.

43.     The defendants listed in ¶¶ 29-41 are collectively referred to herein as the "Individual Securities Act Defendants." DXC, HPE, and the Individual Securities Act Defendants are collectively referred to herein as "Securities Act Defendants."

44.     Lawrie and Saleh are collectively referred to herein as the "Individual Exchange Act Defendants." DXC, Lawrie, and Saleh are collectively referred to herein as the "Exchange Act Defendants." The Securities Act Defendants and the Exchange Act Defendants are collectively referred to herein as the "Defendants."

45.     As major shareholders, directors, and/or executive officers of DXC, all of the Individual Securities Act Defendants participated in the solicitation and sale of DXC common stock in the Merger for their own benefit and the benefit of DXC. The Individual Securities Act Defendants were key members of the Merger working group and the executives and directors of DXC who pitched CSC investors to exchange their shares in the Merger. For instance, Lawrie presented during DXC's Investor Day on March 29, 2017, before completion of the Merger in April 2017.

## IV.     SECURITIES ACT ALLEGATIONS

### A.     DXC's Business and History

46.     A Fortune 500 company, DXC is, according to its 2018 annual report, "the world's leading independent, end-to-end IT services company, serving nearly 6,000 private and public-sector clients from a diverse array of industries across 70 countries."

47.     DXC has two reporting segments: Global Business Services ("GBS") and Global Infrastructure Services ("GIS"). GBS offers enterprise, cloud applications, and consulting, application services, analytics, business process services, and industry software and solutions. GIS offers cloud and platform services, workplace and mobility services, and security solutions. DXC previously had a United States Public Sector ("USPS") segment, which delivered IT services and business solutions to all levels of government in the United States. On May 31, 2018, DXC announced its plan to spin off the USPS business, which it completed on May 31, 2018.

48.     DXC is the result of the combination of two large IT services businesses, CSC and HPE's Enterprise Services division ("HPES"). In May 2016, CSC and HPE publicly announced the merger of CSC and HPES, which was completed in April 2017. The Merger was structured as a so-called "Reverse Morris Trust," wherein HP spun off HPES into a new company, and then the new company purchased CSC to form DXC. CSC shareholders' stock was converted to DXC stock on a one-to-one basis.

**B.      The Merger and Issuance of DXC Shares**

49.     On November 2, 2016, DXC filed with the SEC a draft Registration Statement on Form S-4 with the SEC to register the DXC shares to be issued and exchanged in the Merger.

50.     After filing several amendments, on February 24, 2017, DXC filed with the SEC a final amendment to the Registration Statement on Form S-4/A, which forms part of the Registration Statement.

51.     On February 27, 2017, the SEC declared the Registration Statement effective. On the same day, DXC filed with the SEC its prospectus on Form 424B3, which forms part of the Registration Statement.

52.     DXC was formed on April 1, 2017, when CSC, HPE, Everett SpinCo, Inc. ("Everett"), a wholly-owned subsidiary of HPE, and New Everett Merger Sub Inc., a wholly-owned subsidiary of Everett ("Merger Sub"), completed the combination of CSC with HPES. The combination was accomplished through a series of transactions that included the transfer by HPE of HPES to Everett, spin-off by HPE of Everett on March 31, 2017, and the merger of Merger Sub with

and into CSC on April 1, 2017. At the time of the Merger, Everett was renamed DXC, and as a result of the Merger, CSC became a direct wholly-owned subsidiary of DXC.

53.     When the Merger was completed on April 1, 2017, DXC issued approximately 141 million new shares of DXC common stock directly to former shareholders of CSC. These new shares of DXC stock were issued pursuant to the Registration Statement.

54.     On April 3, 2017, DXC common stock began publicly trading on the NYSE under the symbol "DXC" at approximately $59 per share.

**C.     Misrepresentation of DXC's Workforce Optimization Plan**

55.     DXC's Registration Statement issued in connection with the Merger contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and omitted required disclosures, in violation of Section 11 of the Securities Act, because the Registration Statement failed to adequately disclose facts and risks that existed at the time of the Merger regarding DXC's so-called "workforce optimization" plan.

56.     The DXC Registration Statement touted the more than $1 billion in synergies that DXC would purportedly experience in the first year after the Merger due to a "workforce optimization" plan that would "align [DXC's] costs with its revenue trajectory." In DXC's Investor Day presentation on March 29, 2017, just days before the Merger, the Company highlighted "[w]orkforce optimization," which entailed, among other things, "[c]onsolidat[ing] redundant roles across all functions," "[i]increas[ing] productivity," and "[a]lign[ing] costs to benchmarks."

57.     In stark contrast with the rational workforce optimization process presented above, in reality, DXC planned a dramatic and accelerated workforce reduction in the first year following the Merger, at a scale much larger than was indicated to investors. This actual plan involved major undisclosed risks that the cuts to DXC's workforce would be too large, too soon, resulting in client dissatisfaction and the departure of key employees, which, consequently, would materially harm DXC's ability to secure and generate revenue on new or renewed contracts. Unfortunately for DXC's investors, these undisclosed risks ultimately materialized.

D. **DXC's Extreme Workforce Reduction Plan**

1. **The Hilton Complaint**

58.     Stephen J. Hilton ("Hilton"), a former Executive Vice President ("EVP") at DXC, commenced a lawsuit against his former employer in the U.S. District Court for the Southern District of New York, titled *Hilton v. DXC Technology Company*, Case No. 1:19-cv-01157-PKC. The complaint filed in the *Hilton* Action, alleging various breach of contract claims, was filed on February 6, 2019 (the "Hilton Complaint").

59.     Hilton was hired by CSC in March 2015 as its EVP and General Manager of Global Infrastructure Services. He was personally recruited and interviewed by CSC's CEO at the time, Defendant Lawrie. As head of GIS, Hilton led a department of approximately 15,000 employees and an annual profit and loss of approximately $4 billion. Before joining CSC, Hilton was employed by Credit Suisse as a Managing Director and Chief Information Officer of IT Infrastructure, among other titles.

60.     Following the Merger in April 2017, Hilton became DXC's EVP and Head of Global Delivery. DXC's Global Delivery division had approximately 120,000 employees and 60,000 contractors worldwide and an expense base of approximately $14 billion across 6,000 clients and 70 countries. Approximately three-quarters of DXC's total personnel were located within the Global Delivery division, providing support to the Sell and Build divisions.

61.     As one of the most senior executives at DXC, Hilton was formally named in the Company's "succession plan" as a candidate to replace Defendant Lawrie as CEO in the event of the latter's death or departure. Following disagreements between Hilton and Lawrie, however, DXC terminated Hilton's employment effective July 20, 2018. Notably, the heads of each of the three main divisions—Build, Sell, and Global Delivery—all departed DXC within 15 months after the Merger.

2. **CSC's Pre-Merger Cuts**

62.     Even before the Merger was completed, Hilton had already made significant cuts at CSC. When Hilton became the head of CSC's GIS in March 2015, the division had been missing its internal budget targets by hundreds of millions of dollars per year. These targets were generally set by Defendant Lawrie. Hilton immediately began cutting costs within GIS in an effort to bring the

division within its budget targets, including by canceling programs and creating operational efficiencies. Throughout 2015 and 2016, CSC's board of directors was contemplating a merger with several potential partners, including HPES. For this reason, cutting costs and increasing profitability was important for purposes of finalizing a favorable merger transaction. Nonetheless, illustrating the severity of Lawrie's demanded cuts, GIS missed its internal budget targets in 2015 and 2016.

### 3. DXC's Harmful Implementation of Its Extreme Workforce Reduction Plan

63. As part of the planning and organization process leading up to the Merger, Defendant Lawrie told Hilton that he wanted to achieve major cuts to DXC's total expenses. That primarily meant reducing the number of personnel. Because most of DXC's personnel were located in Global Delivery, most of the Company's workforce cuts would have to occur within that division. Critically, the Global Delivery division included DXC's IT Operations, Application Management, and Business Process Services. In other words, this was the division that housed the Company's IT personnel who served clients in the field.

64. Lawrie and Hilton agreed that DXC could *eventually* cut the Global Delivery division's annual expenses by approximately $2.7 billion—meaning that the division could spend $2.7 billion less annually than its legacy entities, CSC and HPES, together had spent in the year before the April 2017 Merger. The bulk of these cuts would be obtained through workforce reductions. However, it was also acknowledged that aggressive cuts could cause significant loss to the quality of the service that Global Delivery provided to DXC clients. To preserve quality of service, the Global Delivery cuts would have to be implemented over time.

65. DXC could not achieve the $2.7 billion in Global Delivery cuts in one year without causing serious disruption to its customer service. As alleged in the Hilton Complaint, "it was people employed by Global Delivery who provided customer support to the clients won for DXC by sales. ***Precipitous cuts in Global Delivery could be disastrous for DXC's long-term revenue, because***

*those cuts would have a direct impact on customer satisfaction, a point routinely expressed to Hilton by his 'Sell' and 'Build' peers*."[1]

66.    Despite these substantial risks and concerns, DXC's internal budget, established by Defendant Lawrie, called for Global Delivery to make approximately $2.7 billion in cuts within the first 12 months after the Merger. As Hilton alleged, to meet this internal budget target, "*Global Delivery would have to fire far more people far more quickly, with the resulting negative impact on customer satisfaction*."

67.    Hilton "*repeatedly advised Lawrie* about his reservations concerning the pace of cuts." Based on these discussions, Hilton believed that "Lawrie understood that workforce reductions could not be achieved at the pace required by his internal budget without *negative impacts on customer satisfaction*." Although these legitimate and material risks were internally discussed at DXC before the Merger, including by Defendant Lawrie and Hilton, they were not disclosed to investors in the Registration Statement.

68.    Even if, as Hilton alleged, "Lawrie understood his own internal budget to be merely aspirational," it still underscored Defendant Lawrie's desire to aggressively pursue steep and immediate workforce cuts in the Global Delivery division.

69.    At Defendant Lawrie's direction, Hilton faithfully executed sweeping workforce reductions in the Global Delivery division. In the first year following the Merger, according to the Hilton Complaint, DXC *slashed Global Delivery's workforce by approximately 20%* worldwide. And further workforce reductions were soon underway. In addition, Hilton cut hundreds of millions of dollars in annual IT expenditures.

70.    Given Hilton's figure that the division had approximately 180,000 employees and contractors, 20% equates to *36,000 personnel cut in a single year*. This number is roughly consistent with what has been reported in the media. As reported in *The Register*: "DXC started life in April last year with 170,000 employees and by last month this figure was down to at least 150,000.

---

[1] Emphasis is added unless otherwise noted.

Rumours on The Layoff peg that figure at closer to 134,999, but this remains unconfirmed."[2] Based on the rumored figures, DXC eliminated 35,000 personnel. Thus, Hilton achieved much of the workforce reductions that Lawrie sought within the first 12 months after the Merger.

71.     As *The Register* observed, "[i]t isn't just the grunts getting chopped by CEO Lawrie - a bunch of execs left in January, followed by a smattering of others. DXC has a labour pyramid in mind and wants high paid earners out too."[3] This is what DXC has called a "pyramid correction." For example, during an earnings call on August 8, 2017, Defendant Lawrie said, "[i]n our delivery and support organizations, we have removed 4 management layers."

72.     The magnitude of the workforce reductions in year one was much larger than what analysts anticipated based on their communications with DXC's management. For example, in J.P. Morgan's analyst report initiating coverage of DXC, dated April 19, 2017, said: "The company expects delivery optimization, including workforce optimization, could drive *$1.1B in cost cutting over three years (or $400M in year 1)*." Moreover, J.P. Morgan recognized the risks associated with such blood-letting: "**[a]ttracting skills/talent remains a key risk.** There's an inherent culture clash in executing a big cost takeout of labor while re-mixing to high-growth digital areas where the labor market is extremely tight" (emphasis in original). In this way, an overly aggressive workforce reduction plan, such as the one implemented by DXC, can backfire if it repels high-quality personnel needed to execute the company's business strategies.

73.     The Hilton Complaint provides an illustration of the rash and accelerated pace of the workforce reductions: "[i]n one instance dating to September and October 2017, Lawrie gave Hilton one set of targets for workforce reductions in the U.K. and Ireland region team and in the North Central Europe region team—and then, two weeks later, nearly doubled the size of the expected cuts and said he expected those cuts to happen within just weeks." This shows that DXC's workforce reductions were designed to achieve arbitrary cost savings targets, rather than a workforce

---

[2] Paul Kunert, <u>DXC Technology asks filed-based techies if they'd like to leave</u>, THE REGISTER (Aug. 17, 2018, 10:55 AM), https://www.theregister.co.uk/2018/08/17/dxc_latest_in_a_long_line_of_redundancies.

[3] *Id.*

optimization plan designed to "align [DXC's] costs with its revenue trajectory," as the Registration Statement had claimed.

74. According to Hilton, the "many iterations of organizational and personnel plans for the new company" were handled by the head of Human Resources and management consulting firm McKinsey & Co. Hilton observed that the process "was ***chaotic and non-collaborative*** and that many of the decisions were suboptimal for the future success of DXC."

75. Yet, these drastic workforce cuts were still not adequate for Defendant Lawrie. As alleged in the Hilton Complaint, within six months after the Merger, Lawrie sought a substantial reorganization of the Global Delivery division. The resulting restructuring eliminated all but four of Hilton's direct reports and consolidated the vast majority of the Global Delivery division under one of Hilton's direct reports—essentially replacing the leadership of the Global Delivery division. In Hilton's termination letter from Lawrie, one of the cited reasons for the termination was Hilton's "[f]ailure to meet the target in Lawrie's budget for spending cuts within the Global Delivery division."

76. Ultimately, as Hilton alleged, the cuts made in the Global Delivery division "were instrumental in the remarkable increases in earnings per share ['EPS'] that DXC experienced in the first five quarters after the merger." This short-term boost in EPS, however, came at the expense of quality customer service and, in turn, sales. Although the savings were initially rewarded by Wall Street, DXC's financial performance later proved to be illusory.

77. The negative impact of the extreme workforce reduction plan on service delivery, customer satisfaction, and revenues had a built-in lag. As DXC's 2017 annual report stated, "[revenues] are generated by providing services on a variety of contract types lasting from less than six months to ten years or more." Given that the workforce reduction plan could not begin to be implemented until after the Merger, the consequences of inadequate service delivery and dissatisfied clients would not be felt for several quarters.

**E. The Disastrous Impact of the Extreme Workforce Reduction Plan**

78. DXC's workforce reduction plan, substantially executed by Hilton and other senior executives, was simply an earnings management scheme: jettisoning scores of personnel so that the

Company could report more favorable quarterly EPS figures in the short term. But the workforce reductions fell most heavily on the largest of the Company's three divisions, Global Delivery, which included the tens of thousands of employees who were tasked with actually performing the contracts DXC had with its clients—the business unit that actually provided client services in the field. Due to the Company's efforts to reduce costs for purposes of boosting short-term profitability, it had made such drastic workforce reductions that it was hampering its ability to deliver on its client contracts, leading to widespread client dissatisfaction.

79.     In the Fall of 2018, DXC personnel leaks to the media revealed the negative impact of the Company's extreme workforce reduction on customer service delivery. On August 17, 2018, *The Register* published an article titled "DXC Technology asks field-based techies if they'd like to leave,"[4] which reported that "***customer support delivery – we are told by DXCers – is strained due to the headcount reduction****. . . .*"

80.     On October 24, 2018, *The Register* published an article titled "DXC axes Americas boss amid latest deck chair musical,"[5] which reported that the head of DXC Americas, Karan Puri, had been pushed out due to "a double-digit drop in the region's sales." In addition, an inside DXC source told *The Register* that "'***the company is in chaos as all the cuts are leading to mounting customer complaints****.*'" Other DXC sources similarly told the publication that they "were concerned about the impact on serving customers." Indeed, "[o]ne insider told us '***DXC is descending into turmoil****,*' and that earlier this month Lawrie called a 'town hall' meeting to confirm more redundancies on the shop floor and 'blamed Puri for a ***10 to 15 per cent shortfall in [forecast] revenues****.*'"

81.     An article in the Spring of 2019 revealed that DXC's harsh workforce reductions were continuing to backfire. On March 27, 2019, *The Register* published an article titled "DXC: Slashing

---

[4] Paul Kunert, <u>DXC Technology asks filed-based techies if they'd like to leave</u>, THE REGISTER (Aug. 17, 2018, 10:55 AM), https://www.theregister.co.uk/2018/08/17/dxc_latest_in_a_long_line_of_redundancies.

[5] Paul Kunert, <u>DXC axes Americas boss amid latest deck chair musical</u>, THE REGISTER (Oct. 24, 2018, 11:15 AM), https://www.theregister.co.uk/2018/10/24/dxc_axes_americas_boss_amid_latest_deck_chair_musical.

costs affects ability to attract, develop and retain staff? Who'd have thunk it!"[6] The article reported that a DXC executive, during an internal conference call, "said he had experienced layoffs in every quarter since he'd joined DXC Security in August last year, and admitted that chopping overheads had given his unit some challenges." The executive further said, "'[h]ats off' to the managers who were 'trying to work through growth revenue targets, annual booked revenue, total contract value, aligning hiring needs associated with that and then executing[.]'" According to the article, "[h]e described the situation as 'one step forward, two back, two steps forward, one back[,]'" particularly in the United States and United Kingdom—DXC's two largest geographic markets. The article concluded that "[e]fforts to lure, evolve and hold on to staff are proving quite troublesome for DXC Technology's Security practice as the beleaguered outsourcing biz continues to wage war on its cost base."

82.     DXC's disastrous workforce reduction plan continued to have repercussions throughout 2019. On May 23, 2019, DXC issued a press release announcing disappointing financial results for the fiscal year ended March 31, 2019. The Company achieved diluted EPS of $4.35, a 17% decline from the prior year. Revenues likewise declined year-over-year. The Company also provided disappointing 2020 revenue guidance of between $20.7-$21.2 billion.

83.     On May 24, 2019, *The Register* published an article titled "DXC: We axed 10k staff, shut nine data centres, closed 4.6m sq ft of office space… and sales tumbled, funnily enough."[7]

84.     On August 8, 2019, DXC issued a press release announcing its first quarter 2020 financial results, which were again deeply disappointing to the market. The Company stated that diluted EPS for the quarter had declined 22% year-over-year to $0.61 and revised downward its already-disappointing 2020 revenue targets by $500 million.

---

[6] Paul Kunert, <u>DXC: Slashing costs affects ability to attract, develop and retain staff? Who'd have thunk it!</u>, THE REGISTER (Mar. 27, 2019, 10:56 AM), https://www.theregister.co.uk/2019/03/27/dxc_cost_cutting_impacts_ability_to_attract_develop_and_retain_staff.

[7] Paul Kunert, <u>DXC: We axed 10k staff, shut nine data centres, closed 4.6m sq ft of office space… and sales tumbled, funnily enough</u>, THE REGISTER (May 24, 2019, 6:53 PM), https://www.theregister.co.uk/2019/05/24/dxc_fy2019_q4_results.

85.     After the illusory, short-term benefits of the extreme workforce reduction plan had dissipated, and it had become clear that the short-sighted strategy backfired, DXC changed its leadership. On September 11, 2019, DXC announced Defendant Lawrie's retirement as DXC's President and CEO and the appointment of Mike Salvino ("Salvino") as his replacement, effective immediately.

86.     On November 11, 2019, DXC issued a press release announcing disappointing financial results for second quarter 2020. The Company achieved diluted EPS of –$8.19, compared to $0.92 in the prior year second quarter. Revenues also declined year-over-year by 3.2%. In addition, the Company revised its 2020 annual revenue guidance downward from a range of $20.2-$20.7 billion to a range of $19.5-$19.8 billion.

87.     During Salvino's first earnings conference call as DXC's CEO on November 11, 2019, he tacitly acknowledged the foregoing service delivery and personnel retention problems, which directly resulted from his predecessor's workforce reduction plan:

(a)     "[W]e will invest to **stabilize key accounts and ensure that our delivery is meeting our clients' expectations**."

(b)     "We need to focus more on our people and strengthening our employee value proposition. Our people need to be clear about their career path at DXC, the opportunities to work with new clients, and also the opportunities for rescaling and retraining. Being clear about these items will help create an environment where people are acknowledged, recognized and rewarded, which will **improve employee satisfaction and increase retention**."

(c)     "**[E]xecution challenges from recent delivery actions have negatively impacted some of our large customers, which results in lower margins, delayed revenue and bookings as customers have placed the additional work on hold.** We have recovery plans under way for these accounts, but we need to do a better job running operations. By doing this, we will earn the right to expand our footprint with customers."

(d)     "This [downward] revised revenue guidance is driven by three primary factors. . . . Second, **due to execution at existing customers, we now expect $250 million less revenue this year. $75 million of that amount is due to certain customers placing revenue**

*opportunities on hold. This was due to recent delivery execution issues*. Now we have recovery plans under way to improve service levels on these accounts. We also adjusted our revenue outlook by $175 million to reflect potential disruptions given the announcement that we are pursuing strategic alternatives for three of our businesses."

88.     By the commencement of the *Costanzo* Action, DXC stock was trading as low as $32.70 per share, a nearly 45% decline from the $59 price of DXC stock at the time of the Merger. As a result of the Securities Act Defendants' violations of the Securities Act, and the precipitous decline in the market value of the Company's stock, Plaintiffs have suffered significant losses and damages.

## V.     THE SECURITIES ACT DEFENDANTS' ACTIONABLE MISREPRESENTATIONS AND OMISSIONS IN DXC'S REGISTRATION STATEMENT

89.     The Individual Securities Act Defendants were, at the very least, negligent, in their preparation of the Registration Statement. As a result, the Registration Statement contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

### A.     Material Misrepresentations

90.     The Registration Statement repeatedly claimed that the Merger would generate enormous "net synergies" and "strategic and financial benefits." In particular, the Registration Statement in several places highlighted more than $1 billion in synergies that DXC would purportedly experience in the first year after the Merger due to "workforce optimization," as well as a $1.5 billion synergy run rate. For example:

> The combined company expects that the merger of Everett with CSC will produce *first-year synergies of approximately $1.0 billion post-close, with a run rate of $1.5 billion by the end of year one*. The $1.0 billion post-close and $1.5 billion run rate at the end of year one were each calculated by estimating the expected value of harmonizing policies and benefits between the two companies, supply chain and procurement benefits from expected economies of scale such as volume discounts as well as *cost synergies expected from workforce optimization such as elimination of duplicative roles and other duplicative general, administrative and overhead costs*.

Moreover, the Registration Statement detailed a "turnaround plan" that would "***align [DXC's] costs with its revenue trajectory***" and purportedly included "initiatives to improve execution in sales performance and accountability."

91.     The statements above were materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts that existed at the time of the Merger:

(a)     the so-called "workforce optimization" highlighted in the Registration Statement involved crippling the Company's workforce infrastructure;

(b)     DXC planned to jettison tens of thousands of employees on a destructively expeditious timeline, including some of the Company's most highly skilled and longest-tenured employees;

(c)     these workforce reductions were made to inflate reported earnings and other financial metrics in the short-term at the expense of client service delivery;

(d)     Defendant Lawrie had plans for $2.7 billion of cost reductions in the first year, nearly double the $1.5 billion run rate savings target that was made public;

(e)     as a result of these workforce reductions, DXC materially hampered its ability to deliver on client contracts, endangering longer-term revenue growth; and

(f)     internally, senior executives had voiced concerns that the targeted reductions would be unachievable without causing massive damage to the Company's customer relationships.

92.     In addition, the Registration Statement highlighted the size, breadth, and experience of DXC's workforce, as well as the newly formed Company's ability to bolster its workforce through improved hiring and retention practices and workforce optimizations. Specifically, the Registration Statement represented that DXC could "attract and retain highly motivated people with the skills necessary to serve their customers," and that DXC would continue to "hire, train, motivate and effectively utilize employees with the right mix of skills and experience to meet the needs of its clients." The Registration Statement also stated that, "with a collective workforce of approximately 178,000 employees . . . the size and scale of the combined company [would] enhance its ability to

provide value to its customers through a broader range of resources and expertise to meet their needs."

93.     The statements above were materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts that existed at the time of the Merger:

(a)     the so-called "workforce optimization" highlighted in the Registration Statement involved crippling the Company's workforce infrastructure;

(b)     DXC planned to jettison tens of thousands of employees on a destructively expeditious timeline, including some of the Company's most highly skilled and longest-tenured employees;

(c)     Defendant Lawrie had plans for $2.7 billion of cost reductions in the first year, nearly double the $1.5 billion run rate savings target that was made public; and

(d)     and as a result of these workforce reductions, DXC seriously harmed its ability to attract and retain high-quality personnel, which in turn undermined its ability to deliver client services.

**B.     Failure to Make Required Disclosures**

**1.     Disclosure Obligations Under the Securities Act**

94.     "The Securities Act of 1933 . . . was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud, and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976); *see also Randall v. Loftsgaarden*, 478 U.S. 647, 659 (1986) (The Securities Act aims "to place adequate and true information before the investor"); *Pinter v. Dahl*, 486 U.S. 622, 638 (1988) ("The primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce.").

95.     To effectuate this purpose, a company's registration statement must provide a full disclosure of material information. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 381

(1983). Failure to do so gives rise to private rights of action under the Securities Act. *Id.* at 381-82 (Private rights of action were "designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering."); *see also* 15 U.S.C. § 77k(a).

## 2.   Item 303 Disclosure Requirements

96.     Item 303 of SEC Regulation S-K imposes an affirmative duty on issuers to disclose "known trends or uncertainties that the registrant reasonably expects will have a material impact on net sales, revenues, or income from continuing operations." Mgmt.'s Discussion & Analysis of Fin. Condition & Results of Operations, SEC Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). "[T]he Instructions to Item 303 state that MD&A 'shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.'" *Id.*

97.     Pursuant to Item 303(a), a registrant is required to:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(ii); *see also* S.E.C. Release No. 6835, 1989 WL 1092885, at *8 ("Other non-recurring items should be discussed as unusual or infrequent events or transactions that materially affected the amount of reported income from continuing operations.") (citation and quotation marks omitted).

98.     Thus, even a one-time event, if "reasonably expect[ed]" to have a material impact on results, must be disclosed. Examples of such required disclosures include: "[a] reduction in the registrant's product prices; erosion in the r[e]gistrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract." *Id.* at *4.

99.     Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information." *See id.* at *3. Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an

opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." *Id.* at *3, 17. Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See* Comm'n Guidance Regarding Mgmt.'s Discussion & Analysis of Fin. Condition & Results of Operations, SEC. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

100.    As the facts set forth in the Hilton Complaint show, DXC's senior executives were aware of—and actually discussed—concerns that implementation of Defendant Lawrie's aggressive workforce reduction plan, due to its magnitude and accelerated timing, would negatively impact client service delivery, desired personnel retention, and future revenues and profitability. Thus, the workforce reduction plan created "uncertainties that [DXC] reasonably expect[ed] [would] have a material impact on net sales, revenues, or income from continuing operations."

### 3.    Item 503 Disclosure Requirements

101.    Item 503(c) of SEC Regulation S-K ("Item 503") is intended "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." Sec. Offering Reform, SEC Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004). Accordingly, Item 503 requires that offering documents "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c). The discussion of risk factors "must be specific to the particular company and its operations, and should explain how the risk affects the company and/or the securities being offered. Generic or boilerplate discussions do not tell the investors how the risks may affect their investment." Statement of Comm'n Regarding Disclosure of Year 2000 Issues & Consequences by Pub. Companies, Inv. Advisers, Inv. Companies, & Mun. Sec. Issuers, SEC Release No. 1149 (July 29, 1998).

102.    The Registration Statement violated Item 503 by failing to adequately disclose the risks posed by DXC's actual workforce reduction plan, even though they were some of the most

significant factors that made an investment in DXC shares speculative or risky. Specifically, the Registration Statement omitted the specific risks arising from DXC's plan to achieve up to $2.7 billion in cost savings in the first year after the Merger—the vast majority of which would be generated by jettisoning tens of thousands of employees on a destructively expeditious timeline, including some of the Company's most highly skilled and longest-tenured employees. The omitted risks include that the so-called "workforce optimization" highlighted in the Registration Statement would:

> (a)    cripple DXC's workforce infrastructure;

> (b)    materially hamper DXC's ability to deliver on client contracts, endangering its longer-term revenue growth; and

> (c)    seriously harm DXC's ability to attract and retain high-quality personnel, which in turn would undermine its ability to deliver client services.

103.    The "Risk Factors" section of the Registration Statement contains the following risk disclosures:

> ***The combined company may not realize the anticipated benefits from the Transactions.***
>
> The combined company is expected to realize cost and revenue synergies, growth opportunities, and other financial and operating benefits as a result of the Transactions. The combined company's success in realizing these benefits, and the timing of their realization, depends on the successful integration of the business operations of Everett with CSC. Even if CSC and Everett successfully integrate, CSC and Everett cannot predict with certainty if or when these cost and revenue synergies, growth opportunities and benefits will occur, or the extent to which they actually will be achieved. For example, the benefits from the Transactions may be offset by costs incurred in integrating the companies or in required capital expenditures related to the acquired Everett business. In addition, the quantification of synergies expected to result from the Transactions is based on significant estimates and assumptions that are subjective in nature and inherently uncertain. Realization of any benefits and synergies could be affected by a number of factors beyond CSC's, Everett's or the combined company's control, including, without limitation, general economic conditions, increased operating costs, regulatory developments and the other risks described in these risk factors. The amount of synergies actually realized in the Transactions, if any, and the time periods in which any such synergies are realized, could differ materially from the expected synergies discussed in this proxy statement/prospectus-information statement, regardless of whether the two business operations are combined successfully. If the integration is unsuccessful or if the

combined company is unable to realize the anticipated synergies and other benefits of the Transactions, there could be a material adverse effect on the combined company's business, financial condition and results of operations.

\* \* \* \*

**_The ability of the combined company to provide customers with competitive services is dependent on the ability of the combined company to attract and retain qualified personnel._**

The ability of the combined company to grow and provide customers with competitive services is partially dependent on the ability of the combined company to attract and retain highly motivated people with the skills necessary to serve their customers. The markets the combined company expects to serve are highly competitive and competition for skilled employees in the technology outsourcing, consulting and systems integration and enterprise services markets is intense for both on-shore and offshore locales. The loss of personnel could impair the ability of the combined company to perform under certain contracts, which could have a material adverse effect on the consolidated financial position, results of operations and cash flows of the combined company.

The combined company will be dependent upon the management skills and continued services of members of its senior management team. The failure of such key personnel to continue to be active in the management of the business could have a material adverse effect on relationships with third parties, business, financial condition and results of operations. In addition, the combined company's failure to attract and retain key personnel would adversely impact its ability to grow the Everett business.

If the combined company does not hire, train, motivate and effectively utilize employees with the right mix of skills and experience in the right geographic regions to meet the needs of its clients, its financial performance could suffer. For example, if its employee utilization rate is too low, the combined company's profitability and the level of engagement of its employees could suffer. If that utilization rate is too high, it could have an adverse effect on employee engagement and attrition and the quality of the work performed, as well as the combined company's ability to staff projects. If the combined company is unable to hire and retain a sufficient number of employees with the skills or backgrounds to meet current demand, the combined company might need to redeploy existing personnel, increase its reliance on subcontractors or increase employee compensation levels, all of which could also negatively affect the combined company's profitability. In addition, if the combined company has more employees than it needs with certain skill sets or in certain geographies, the combined company may incur increased costs as it works to rebalance its supply of skills and resources with client demand in those geographies.

104.    These risk statements, however, fail to adequately disclose the specific risks identified above regarding DXC's drastic workforce reduction plan.

---

## VI.   CLAIMS BROUGHT PURSUANT TO THE SECURITIES ACT

### COUNT I

### FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT

### (Against the Securities Act Defendants)

105.   Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 89-104 above. Plaintiffs specifically disclaim any allegations that are based on fraud, recklessness, or intentional misconduct.

106.   This count is brought by Plaintiffs pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k against the Securities Act Defendants. Defendants named in this Count were responsible for the contents and dissemination of the Registration Statement; signed the Registration Statement; and/or were directors who are appropriate defendants in this Count.

107.   This claim is brought by Plaintiffs to recover for injuries they suffered as a result of their purchases or other acquisitions of DXC common stock pursuant to and/or traceable to the Company's Registration Statement issued in connection with the Merger.

108.   The Registration Statement was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

109.   DXC is the registrant and issuer for the common stock sold in the Merger. As the issuer, DXC is strictly liable to Plaintiffs for the misrepresentations and omissions in the Registration Statement. The other Defendants named in this Count were responsible for the contents and dissemination of the Registration Statement.

110.   Defendants named in this Count owed to the Plaintiffs, as purchasers of shares obtained through the Registration Statement, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

111.   None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration

Statement were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

112.    Defendants named in this Count issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements and/or omissions to the investing public, including the Plaintiffs, that were contained in the Registration Statement, which misrepresented or failed to disclose, among other things, the facts set forth above. By reason of the conduct alleged herein, Defendants named in this Count violated and/or controlled a person who violated Section 11 of the Securities Act.

113.    At the times they obtained their shares of DXC, Plaintiffs did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

114.    Plaintiffs allege that this suit was filed within three years of the effective date of Registration, and, pursuant to *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), the one-year statute of limitations was tolled upon the filing of the *Costanzo* Action. The *Costanzo* Action was filed within one year following the time when investors discovered or could have, in the exercise of reasonable due diligence, discovered the existence of the misrepresentations that form the basis of these claims.

115.    By reason of the foregoing, Plaintiffs are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from Defendants named in this Count and each of them, jointly and severally.

## **COUNT II**

### **FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT**

### **(Against the Individual Securities Act Defendants and HPE)**

116.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 89-104 above. Plaintiffs specifically disclaim any allegations that are based on fraud, recklessness, or intentional misconduct.

117.    This Count is brought by Plaintiffs against the Individual Securities Act Defendants and HPE pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o.

118.     This Count is asserted against the Individual Securities Act Defendants and HPE, each of whom was a control person of DXC during the relevant time period.

119.     The Individual Securities Act Defendants were each control persons of DXC by virtue of their positions as directors, senior officers, and/or authorized representatives of DXC. The Individual Securities Act Defendants had the ability to cause their respective companies to agree to and complete the Merger and disseminate the Registration Statement in connection therewith.

120.     HPE owned and controlled DXC before, during, and after the Merger by virtue of its control of HPE Enterprise Services and control over the most senior executives of DXC and the members of the DXC's Board of Directors. Even after the Merger, HPE shareholders owned 50.1% of DXC's outstanding common shares.

121.     Defendants named in this Count were each culpable participants in the violations of Section 11, based on their having prepared and disseminated the Registration Statement, signed or authorized the signing of the Registration Statement, facilitated the spin-merger transaction, and having otherwise participated in the process that allowed the issuance of DXC shares in the Merger to be completed. Further, Defendants named in this Count were in positions to control, and did control, the misrepresentations and omissions contained in the Registration Statement.

122.     Plaintiffs allege that this suit was filed within three years of the effective date of Registration, and, pursuant to *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), the one-year statute of limitations was tolled upon the filing of the *Costanzo* Action. The *Costanzo* Action was filed within one year following the time when investors discovered or could have, in the exercise of reasonable due diligence, discovered the existence of the misrepresentations that form the basis of these claims.

123.     By reason of the above conduct, as set forth above, the Individual Defendants are jointly and severally liable with and to the same extent as DXC pursuant to Section 15 of the Securities Act.

**VII.     EXCHANGE ACT ALLEGATIONS**

124.     At the first DXC investor day for analysts on March 29, 2017—just prior to the close of the acquisition and the beginning of the Relevant Period—Defendant Lawrie told investors that

the Exchange Act Defendants had a "very straightforward" plan: DXC would overcome the declining traditional IT market by leveraging the combined client base of CSC and HPE to drive costs lower, and in turn convince those clients to "reinvest that savings back into modernizing your application portfolio" and embark on a "Digital Transformation" through DXC's digital solutions and services.

125.    Thus, critical to this plan, were the billions of dollars in synergies that the Exchange Act Defendants said would allow the Company to generate $2.5 billion in cost-savings over DXC's first three years, with $1 billion in cost-savings in DXC's first year alone.

126.    Chief among these "cost-savings" efforts was the Exchange Act Defendants' "workforce optimization" plan, pursuant to which DXC would fire thousands of employees. Given the reasonable concern that such a massive disruption to the Company's workforce could threaten the Company's ability to deliver, the Exchange Act Defendants actively reassured the market throughout the Relevant Period that the Company's cost-cutting efforts were not hurting the Company's "critical" ability to execute for clients.

127.    Throughout the Relevant Period, the Exchange Act Defendants knowingly or recklessly misrepresented the effects of the Company's radical merger integration and cost-cutting efforts. This began with savings projections in the Registration Statement at a time when Hilton and others had already warned the Exchange Act Defendants that service levels and customer relationships were already suffering from the cuts that had been implemented to that point. The fraud continued post-Merger when the Exchange Act Defendants repeatedly touted the success of the efforts, despite being told repeatedly by employees that the situation was descending into chaos. When the truth began to emerge months later, the stock price declined materially.

## VIII.   THE EXCHANGE ACT DEFENDANTS' ACTIONABLE MISREPRESENTATIONS AND OMISSIONS

### A.      Material Misrepresentations in the Registration Statement

128.    The Registration Statement repeatedly claimed that the Merger would generate enormous "net synergies" and "strategic and financial benefits." In particular, the Registration Statement in several places highlighted more than $1 billion in synergies that DXC would

purportedly experience in the first year after the Merger due to "workforce optimization," as well as a $1.5 billion synergy run rate. For example:

> The combined company expects that the merger of Everett with CSC will produce *first-year synergies of approximately $1.0 billion post-close, with a run rate of $1.5 billion by the end of year one*. The $1.0 billion post-close and $1.5 billion run rate at the end of year one were each calculated by estimating the expected value of harmonizing policies and benefits between the two companies, supply chain and procurement benefits from expected economies of scale such as volume discounts as well as *cost synergies expected from workforce optimization such as elimination of duplicative roles and other duplicative general, administrative and overhead costs*.

Moreover, the Registration Statement detailed a "turnaround plan" that would "*align [DXC's] costs with its revenue trajectory*" and purportedly included "initiatives to improve execution in sales performance and accountability."

129.    The statements above were materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts that existed at the time of the Merger:

(a)    the so-called "workforce optimization" highlighted in the Registration Statement involved crippling the Company's workforce infrastructure;

(b)    DXC planned to jettison tens of thousands of employees on a destructively expeditious timeline, including some of the Company's most highly skilled and longest-tenured employees;

(c)    these workforce reductions were made to inflate reported earnings and other financial metrics in the short-term at the expense of client service delivery;

(d)    Defendant Lawrie had plans for $2.7 billion of cost reductions in the first year, nearly double the $1.5 billion run rate savings target that was made public;

(e)    as a result of these workforce reductions, DXC materially hampered its ability to deliver on client contracts, endangering longer-term revenue growth; and

(f)    internally, senior executives had voiced concerns that the targeted reductions would be unachievable without causing massive damage to the Company's customer relationships.

130.     In addition, the Registration Statement highlighted the size, breadth and experience of DXC's workforce, as well as the newly formed Company's ability to bolster its workforce through improved hiring and retention practices and workforce optimizations. Specifically, the Registration Statement represented that DXC could "attract and retain highly motivated people with the skills necessary to serve their customers," and that DXC would continue to "hire, train, motivate and effectively utilize employees with the right mix of skills and experience to meet the needs of its clients." The Registration Statement also stated that, "with a collective workforce of approximately 178,000 employees . . . the size and scale of the combined company [would] enhance its ability to provide value to its customers through a broader range of resources and expertise to meet their needs."

131.     The statements above were materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts that were known, or in the absence of recklessness should have been known, to the Exchange Act Defendants at the time:

(a)     the so-called "workforce optimization" highlighted in the Registration Statement involved crippling the Company's workforce infrastructure;

(b)     DXC planned to jettison tens of thousands of employees on a destructively expeditious timeline, including some of the Company's most highly skilled and longest-tenured employees;

(c)     Defendant Lawrie had plans for $2.7 billion of cost reductions in the first year, nearly double the $1.5 billion run rate savings target that was made public; and

(d)     as a result of these workforce reductions, DXC seriously harmed its ability to attract and retain high-quality personnel, which in turn undermined its ability to deliver client services.

**B.     The Exchange Act Defendants' False and Misleading Statements and Omissions Concerning DXC's Revenue Growth**

**1.     The Fiscal Year 2018 Guidance**

132.     On May 25, 2017, Defendants Lawrie and Saleh participated in DXC's earnings call for the fourth quarter and fiscal year 2019, during which they reiterated the previously provided fiscal

year 2018 guidance, and assured investors that they were on track to achieve those targets. Specifically, during that call, Defendant Lawrie stated:

> And then finally, as we discussed at our recent DXC Technology Investor Day, for fiscal 2018, *we're targeting revenue to be in the $24 billion to $24.5 billion* and our non-GAAP EPS from continuing operations target is $6.50 to $7, and our adjusted free cash flow target is 100% or more of adjusted net income.

> * * * *

> Now, when you throw in the acquisitions like UXC and Xchanging, which is really how we look at the business, I mean, we're getting substantial now revenue growth from these new offerings, including our acquisitions. *I think the revenue case that we've laid out at the Analyst Meeting from a constant currency basis is still the range that we see operating in as we go through fiscal 2018*. So, really no change.

133.    On August 8, 2017, Defendants Lawrie and Saleh participated in DXC's earnings call for the first quarter fiscal year 2018, during which they reiterated the previously provided fiscal year 2018 guidance, and assured investors that they were on track to achieve those targets. Specifically, during that call, Defendant Lawrie stated:

> And then finally for fiscal 2018, *we continue to target revenue of $24 billion or $24.5 billion* in constant currency, and our target for non-GAAP EPS remains $6.50 to $7 with an adjusted free cash flow target of 100% or more of adjusted net income.

> * * * *

> Now collectively, these cost actions generate approximately $140 million in Q1 savings, which puts us on track for the fiscal 2018 synergy targets that we discussed at our Investor Day in March.

> * * * *

> So it's a very solid quarter, we executed our synergies plan, $140 million is good. So you multiply that out by four and you get a number and there is more synergies that we're going to get incrementally in the second quarter that would be repeated three times and there will be more synergies in the third quarter so on and so forth. So, I think, it's – I think it will be premature to talk about a change to the targets that we've outlined. *I think the important point here is we are executing as we said we're going to execute and this was a good first data point against that plan.* And in terms of EPS, I think the EPS is going to largely track the way we laid it out at the Investor Day.

134.    Likewise, during that August 8, 2017 call, Defendant Saleh stated:

> [S]o *I would expect the second quarter to maybe look pretty much like this one*, maybe a little bit less when you exclude the improvement in our synergies in the second quarter, we'll offset some of the benefit we had in the first quarter from the FX. We had $75 million in our results, but net-net, *you're going to continue to see*

*every quarter an expansion in margins across all the businesses* and you were going to see basically our EPS pick up particularly you'll see the ramp in the third quarter and fourth quarter.

135.    On November 7, 2017, Defendants Lawrie and Saleh participated in DXC's earnings call for the second quarter fiscal year 2018, during which they reiterated the previously provided fiscal year 2018 guidance, and assured investors that they were on track to achieve those targets. Specifically, during that call, Defendant Lawrie stated:

> And then finally, *for fiscal 2018, we continue to target revenue of $24 billion to $24.5 billion* in constant currency.
>
> * * * *
>
> What we are seeing is, we are seeing a moderation in some of the headwinds in the IPO business. And more importantly, *we're seeing good growth in our Digital offerings as we reported this quarter, and we're seeing pretty good growth in our industry IP and BPS,* particularly when you judge for the runoff of some of these big health care contracts. I wouldn't jump to any conclusions here that there's a significant change over what we've already talked about.
>
> In the case of USPS, USPS has a pretty significant backlog. *And as they hire more people and bring those people on, then they're able to build that revenue out.* And that's a partial explanation to why you saw a slight acceleration in the revenue.

136.    On February 8, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the third quarter fiscal year 2018, during which they reiterated the previously provided fiscal year 2018 guidance, and assured investors that they were on track to achieve those targets. Specifically, during that call, Defendant Lawrie stated:

> Finally, *for fiscal 2018, we continue to target revenue of $24 billion to $24.5 billion* in constant currency, and we are increasing our fiscal 28 (sic) [2018] target on non-GAAP EPS to a range of $7.50 to $8, reflecting additional synergy realization this year. And our adjusted free cash flow target remains 90% of adjusted net income.
>
> * * * *
>
> In our pilot accounts, we increased digital pipeline by 30% and created several new opportunities valued at more than $200 million each. We also leverage these initial engagements to develop a DXC digital framework which aligns DXC assets, capabilities and partner offerings to create a reusable digital transformation blueprint. This allows us to quickly shape modular transformation road maps tied to clear business outcomes for our clients, *while unlocking greater share of wallet and overall revenue growth for DXC.*
>
> * * * *

*We're seeing good growth in all parts of the world*. I mean, when was the last time you saw Europe and Japan and China and India and the U.S., all growing? So I'm pretty optimistic about the longer term demand profile.

Now, there's a lot of work to do to capture that demand, and I don't want to, in any way, shape or form minimize the amount of work ahead. But there clearly is a good opportunity, and we are continuing to transition our business to much more digital, much more of our industry IP and BPS businesses that we have been investing for some time.

137.    During that February 8, 2018 call, Defendant Saleh responded to an analyst question about contextualizing the statement that "now that we have three of the four quarters, it suggests that the final quarter is going to grow year-over-year":

I think, you're absolutely right. I think if you look at it, *at this level, we would be posting some revenue growth on a year-over-year basis*. And as you look back at, historically, HPES on their fourth quarter which really is the November to January quarter for them, they typically saw a significant decline sequentially because of their quarter end of October. You saw a lot of one-time or accelerated revenue recognition. And so, you saw a price down or other kind of a decline sequentially. I think last year it was close to a few hundred million dollars sequentially. And this year, I think, as you could see, we've been able to mitigate those kinds of declines, both the project work and mitigating [indiscernible] (45:05). . . . But you're absolutely right. At these levels, we would show growth year-over-year.

138.    The Exchange Act Defendants' statements quoted in ¶¶ 132-37 above were materially false and misleading when made because, as the Exchange Act Defendants have admitted and as discussed further above: (1) the Exchange Act Defendants had "been primarily focused on taking people out" and "more preoccupied with [cost-cutting] than growth," which they understood—but concealed from investors—undermined the Company's "pivot to growth" in revenue because "there is some trade-off between revenues and cost"; (2) the Exchange Act Defendants were engaged in reckless cost-cutting measures, including quota-driven workforce optimization designed to manage earnings, that they knew—but concealed from investors—caused serious execution issues and delayed DXC from bringing on the resources needed to support digital growth; and (3) the Exchange Act Defendants had no reasonable basis for their revenue projections.

### 2.    The Fiscal Year 2019 Guidance

139.    On May 24, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the fourth quarter and fiscal year 2018, during which the Exchange Act Defendants provided the

Company's fiscal year 2019 guidance (the "Fiscal Year 2019 Guidance"). Specifically, during that call, Defendant Lawrie stated:

> For fiscal 2019, *we expect revenue to be $21.5 billion to $22 billion*, which excludes the USPS business. There are several positive things contributing to that target as well as a couple of mitigating factors. *We continue to accelerate the growth in our digital and industry IP offerings, and our BPS business is also demonstrating strong momentum*. We do expect some additional revenue dis-synergies next year as well as the ongoing headwinds in traditional services that we had previously discussed. Also, the revenue from our HPE contract associated with the merger will normalize this year at a bit lower rate, and we continue to gauge the potential impact of Brexit in our U.K. business. We're targeting non-GAAP EPS of $7.75 to $8.15 and adjusted free cash flow to be 90% or more of adjusted net income.

140.    Likewise, during that May 24, 2018 call, Defendant Saleh stated:

> Now let me close with fiscal '19 targets, all of which will now exclude USPS. *We're targeting revenue for the fiscal year to be $21.5 billion to $22 billion. This compares with $21.7 billion in fiscal '18*. Our fiscal 2019 target for non-GAAP EPS from continuing operations is $7.75 to $8.15. Now this compares with roughly $6.70 for fiscal 2018, which was recast to exclude earnings per share associated with the USPS business and adjusted for any stranded G&A cost. Our EPS target assume a tax rate of 24% to 28% for the full year, and our adjusted free cash flow target for fiscal 2019 is 90% or more of adjusted net income. . . .

> I think *what we will see is a relatively consistent performance throughout the year*, growing a little bit more in the second half of the year on a sequential basis.

141.    On August 7, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the first quarter fiscal year 2019, during which they reiterated the previously provided fiscal year 2019 guidance, and assured investors that they were on track to achieve those targets. Specifically, during that call, Defendant Lawrie stated:

> [F]or fiscal '19, *we continue to target revenue of $21.5 billion to $22 billion* and on a non-GAAP EPS of $7.75 to $8.15. Although we are trending to the upper end of that EPS range. And we continue to target adjusted free cash flow of 90% or more of adjusted net income. . . .

> Now, before I turn this over to Paul [Saleh], just to reiterate, *for fiscal 2019, we continue to expect revenue to be $21.5 billion to $22 billion*, and we also continue to target non-GAAP EPS of $7.75 to $8.15. And as I said before, we are trending to the upper end of that range. And we expect adjusted free cash flow to be 90% or more of adjusted net income.

142.    Likewise, during that August 7, 2018 call, Defendant Saleh stated, "in closing, we had a solid start to the year, and we're on pace to deliver against our financial targets for the fiscal year."

143.    On August 15, 2018, DXC held its annual shareholder meeting, during which Defendant Lawrie again reiterated that DXC would achieve its fiscal year 2019 guidance, stating:

> [T]he progress we have made has enabled us to make the ***pivot to growth***, positioning DXC to capitalize on the vast digital opportunities ahead across all industry and offering areas. This momentum was reflected in our fiscal year '19 first quarter earnings announced last week. In the first quarter, we've delivered year-over-year growth in revenue, margins and earnings per share. We had significant margin expansion . . . driven by continued execution of our synergy levers. These levers include workforce optimization, supply chain efficiencies and facilities rationalization. And our first quarter performance ***positions us well to deliver on our financial targets for fiscal 2019***.

144.    The Exchange Act Defendants' statements quoted in ¶¶ 139-43 above were materially false and misleading when made because, as the Exchange Act Defendants have admitted: (1) the Exchange Act Defendants had "been primarily focused on taking people out" and "more preoccupied with [cost-cutting] than growth," which they understood—but concealed from investors— undermined the Company's "pivot to growth" in revenue because "there is some trade-off between revenues and cost"; (2) the Exchange Act Defendants knew—but concealed from investors—that, on May 15, 2018, DXC had accused the Executive Vice President in charge of its largest division of "material misconduct" and a "substantial and willful failure" to render services, yet that Executive Vice President would remain in his role even into the second quarter of fiscal year 2019; (3) the Exchange Act Defendants were engaged in reckless cost-cutting measures, including quota-driven workforce optimization designed to manage earnings, that they knew—but concealed from investors—caused serious execution issues and delayed DXC from bringing on the resources needed to support digital growth; and (4) the Exchange Act Defendants had no reasonable basis for their revenue projections.

### 3.    Other False and Misleading Statements Concerning DXC's Revenue

145.    During the February 8, 2018 earnings call, Defendant Lawrie stated that the Exchange Act Defendants' digital business had actually "been a little more successful than we had planned in

terms of offsetting the decline in the legacy infrastructure business . . . a little better than what we had modeled and what we had communicated," and also that the Exchange Act Defendants would "continue with the same play that has given us some of the success around offsetting that decline in the traditional ITO business."

146.    Defendant Lawrie's statements quoted in ¶ 145 above were materially false and misleading when made because, as the Exchange Act Defendants have admitted: (1) the Exchange Act Defendants had "been primarily focused on taking people out" and "more preoccupied with [cost-cutting] than growth," which they understood—but concealed from investors—undermined the stabilization of the Company's revenue because "there is some trade-off between revenues and cost"; and (2) the Exchange Act Defendants' "same play that has given us some of the success around offsetting that decline" primarily consisted of reckless cost-cutting measures, including quota-driven workforce optimization designed to manage earnings as well as the manipulation of compensation targets, that the Exchange Act Defendants knew—but concealed from investors—caused serious execution issues and delayed DXC from bringing on the resources needed to support digital growth.

147.    On June 29, 2018, Defendant DXC filed its annual proxy statement, which was signed by Defendant Lawrie. In it, the Exchange Act Defendants stated that they had "continued to successfully execute on our value creation levers," attaining "stable revenue."

148.    Likewise, on July 18, 2018, DXC filed additional proxy materials, consisting of a presentation entitled "Key Discussion Topics," in which the Exchange Act Defendants again boasted that they had "successfully executed on our value creation levers," attaining "[s]table revenue."

149.    DXC's statements quoted in ¶¶ 147-48 above were materially false and misleading when made because, as the Exchange Act Defendants have admitted and discussed further above: (1) the Exchange Act Defendants had "been primarily focused on taking people out" and "more preoccupied with [cost-cutting] than growth," which they understood—but concealed from investors—undermined the stabilization of the Company's revenue because "there is some trade-off between revenues and cost"; (2) the Exchange Act Defendants knew—but concealed from investors—that, on May 15, 2018, DXC had accused the Executive Vice President in charge of its largest division of "material misconduct" and a "substantial and willful failure" to render services;

and (3) the Exchange Act Defendants' "value creation levers" primarily consisted of reckless cost-cutting measures, including quota-driven workforce optimization designed to manage earnings as well as the manipulation of compensation targets, that the Exchange Act Defendants knew—but concealed from investors—caused serious execution issues and delayed DXC from bringing on the resources needed to support digital growth.

150.    On August 7, 2018, DXC issued a press release announcing its earnings for the first quarter of fiscal year 2019, which quoted Defendant Lawrie as stating, "[w]e continue to build momentum in digital, with double-digit growth in each of our digital areas, and we also drove growth in our industry offerings."

151.    On or about September 5, 2018, Defendant Saleh and other members of DXC management met with analysts at Evercore. At that meeting, as described by Evercore analysts in an October 24, 2018 report, Saleh "confirmed to [Evercore] that in 2H/FY19, DXC should achieve constant currency, organic revenue growth for the first time aided by easier year-over-year comps, a moderation in declines in the legacy business, and 20%+ growth in Digital."

152.    The Exchange Act Defendants' statements quoted in ¶¶ 150-51 above were materially false and misleading when made because, as the Exchange Act Defendants have admitted and discussed further above: (1) the Exchange Act Defendants had "been primarily focused on taking people out" and "more preoccupied with [cost-cutting] than growth," which they understood—but concealed from investors—undermined the Company's revenue growth because "there is some trade-off between revenues and cost"; and (2) the Exchange Act Defendants were engaged in reckless cost-cutting measures, including quota-driven workforce optimization designed to manage earnings as well as the manipulation of compensation targets, that they knew—but concealed from investors—caused serious execution issues that would accelerate, not moderate, declines in the legacy business and delayed DXC from bringing on the resources needed to support digital growth.

**C.    The Exchange Act Defendants' False and Misleading Statements and Omissions Concerning DXC's Workforce Management and "Optimization"**

153.    On May 25, 2017, Defendants Lawrie and Saleh participated in DXC's earnings call for the fourth quarter fiscal year 2017. During that call, Defendant Lawrie stated that "[i]n terms of

some of the workforce optimization things, the de-layering of the organization and beginning to make some of the cuts that we're planning to make, that also is progressing . . . **we've got the organization now pretty much in place**."

154.    On August 8, 2017, Defendants Lawrie and Saleh participated in DXC's earnings call for the first quarter fiscal year 2018. During that call, Defendant Lawrie stated that "[w]e implemented workforce optimization plans and are rapidly consolidating redundant roles across all functions…" including "[i]n our delivery and support organizations, we have removed four management layers." Defendant Saleh stated that "[w]orkforce optimization drove major savings in the quarter." Defendant Lawrie also said that "the most important observation is that we put two pretty big companies together and launched it, and we didn't see the disruption."

155.    On November 7, 2017, Defendants Lawrie and Saleh participated in DXC's earnings call for the second quarter fiscal year 2018. During that call, Defendant Saleh stated that "improvement in our margin reflects cost actions we're taking to optimize our workforce" including "reduc[ing] labor by about 4% in the quarter through a combination of automation, best shoring and pyramid correction."

156.    Defendants Lawrie and Saleh's statements quoted in ¶¶ 153-55 above were materially false and misleading when made because the Exchange Act Defendants' reduction of the Company's labor base was primarily quota-driven workforce reductions designed to optimize earnings, not the Company's workforce, and which the Exchange Act Defendants knew—but concealed from investors—caused serious execution issues and "disruption" and delayed DXC from bringing on the resources needed to support digital growth.

157.    On February 8, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the third quarter fiscal year 2018. During that call, Defendant Lawrie stated that the Exchange Act Defendants had "enhanced" their "workforce management process," which allowed DXC "to more cost-effectively deliver existing business while staffing the required labor for new business."

158.    Defendant Lawrie's statements quoted in ¶ 157 above were materially false and misleading when made because the Exchange Act Defendants' "enhancement" to their "workforce management process" was primarily quota-driven workforce reductions designed to manage

earnings, not the Company's workforce, which the Exchange Act Defendants knew—but concealed from investors—caused serious execution issues in "deliver[ing] existing business" and prevented DXC from "staffing the required labor for new business."

159.    Also during the February 8, 2018 earnings call, Defendant Saleh discussed "cost actions we're taking to optimize our workforce," including specifically that the Exchange Act Defendants had "reduced our labor base by an additional 3% in the quarter through a combination of automation, best shoring and pyramid correction."

160.    Defendant Saleh's statements quoted in ¶ 159 above were materially false and misleading when made because the Exchange Act Defendants' reduction of the Company's labor base was primarily quota-driven workforce reductions designed to optimize earnings, not the Company's workforce, and which the Exchange Act Defendants knew—but concealed from investors—caused serious execution issues and delayed DXC from bringing on the resources needed to support digital growth.

161.    Also during the February 8, 2018 earnings call, Defendant Lawrie said that the Exchange Act Defendants were "making a big, organic investment around trying to ignite . . . digital sales" by "beginning to move in a direction of having one team responsible for the legacy or the run environments that we have, and then a separate team that is focused, in many cases, on disintermediating and driving digital platform growth."

162.    Defendant Lawrie's statements quoted in ¶ 161 above were materially false and misleading when made because the Exchange Act Defendants instituted this sales model after they had already fired, and continued to fire throughout the Relevant Period, substantial numbers of DXC's "subject matter experts" as part of their workforce reduction quotas designed to optimize earnings, which the Exchange Act Defendants knew—but concealed from investors—caused serious execution issues and delayed DXC from bringing on the resources needed to support digital growth. In fact, at the end of the Relevant Period, Defendant Lawrie would admit that for the past two quarters, the Exchange Act Defendants had been using a "generalist sales model" and not a "specialized application sales force"—a decision that, on November 8, 2018, Lawrie also explicitly admitted that he was "responsible" for the Company's failed "generalist" sales approach, and in

connection therewith that he had observed several quarters of "a continued lack of discipline and execution around some of the workforce optimization issues."

163.   On May 24, 2018, Defendant DXC issued a press release, filed on Form 8-K, announcing their fourth quarter and full fiscal year 2018 earnings. That press release quoted Defendant Lawrie as stating that the Exchange Act Defendants had "successfully executed on our strategic roadmap, including the integration of CSC and HPE Enterprise Services, achievement of our first-year financial objectives, and a strengthened leadership position in digital transformation."

164.   Also on May 24, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the fourth quarter and full fiscal year 2018. During that call, Defendant Lawrie stated that "[p]rofit during the first year was . . . better than expected" thanks to "execution of the synergy plans we outlined at our Investor Day last March, including workforce optimization, supply chain efficiencies, policy harmonization and facilities rationalization."

165.   Likewise, also during the May 24, 2018 call, Defendant Saleh attributed DXC's "improvement in profitability" to "cost actions we've taken to optimize our workforce, harmonize our policies, extract greater supply chain efficiencies and rationalize our real estate footprint," stating specifically that DXC had "continued to rebalance our workforce" by reducing DXC's labor base by nearly 12.6% in the prior year, even as the Exchange Act Defendants had hired "roughly 20,000 new employees during the year with a significant focus on digital capabilities."

166.   The Exchange Act Defendants statements quoted in ¶¶ 163-65 above were materially false and misleading when made because, as the Exchange Act Defendants have admitted: (1) the Exchange Act Defendants' "plan" had actually "been primarily focused on taking people out" and "more preoccupied with [cost-cutting] than growth," which they understood—but concealed from investors—undermined the Company's growth because "there is some trade-off between revenues and cost"; (2) the Exchange Act Defendants knew—but concealed from investors—that, on May 15, 2018, DXC had accused the Executive Vice President in charge of Global Delivery, DXC's largest division and thus the group most impacted by the Exchange Act Defendants' workforce actions, of "material misconduct" and a "substantial and willful failure" to render services, yet that Executive Vice President remained in that role; and (3) the "successful[] execut[ion]" of the Exchange Act

Defendants' "strategic roadmap" and "synergy plans" were actually reckless workforce reductions and other cost-cutting measures designed to optimize earnings, not the Company's workforce, and which the Exchange Act Defendants knew—but concealed from investors—caused serious execution issues and delayed DXC from bringing on the resources needed to support digital growth.

167.    Also during the May 24, 2018 earnings call, Lawrie stated that DXC had achieved "significant reductions [in headcount] or, said another way, increased productivity," and boasted, "Our delivery teams continued to drive increased productivity while improving service levels for our clients." Later, Lawrie stated that the Company would "continue to drive productivity and the quality of our service delivery" and that DXC's "improved service levels . . . has an enormously positive impact on our business." Finally, Lawrie stated, "Our customer satisfaction last year went up. So in the first year of integration, all we did, customer satisfaction continued to increase. So continuing to drive our cost structure and the productivity and improve service delivery is an absolutely critical objective as we look out."

168.    Defendant Lawrie's statements quoted in ¶ 167 above were materially false and misleading when made because: (1) the Exchange Act Defendants knew—but concealed from investors—that, on May 15, 2018, DXC had accused the Executive Vice President in charge of Global Delivery, DXC's largest division and thus the group most responsible for the Company's service levels and customer satisfaction, of "material misconduct" and a "substantial and willful failure" to render services, yet that Executive Vice President remained in his role until weeks into the second quarter of fiscal year 2019; and (2) DXC's "significant reductions [in headcount]" were reckless workforce reductions designed to optimize earnings, not increase productivity, and which the Exchange Act Defendants knew—but concealed from investors—had not "improv[ed] service levels for our clients" but instead caused serious execution issues and delayed DXC from bringing on the resources needed to support digital growth.

169.    On May 29, 2018, DXC filed its Form 10-K for fiscal year 2018, which was signed by Defendants Lawrie and Saleh. In the Form 10-K, the Exchange Act Defendants stated as a "Fiscal 2018 Highlight" that DXC had "further enhanced our workforce management processes to cost-effectively deliver existing business while staffing the required labor for new business." The

Exchange Act Defendants further stated, "During fiscal 2018, we took actions to optimize our workforce, extract greater supply chain efficiencies and rationalize our real estate footprint. We reduced our labor base by approximately 13% through a combination of automation, best shoring and pyramid correction."

170.    The Exchange Act Defendants statements quoted in ¶ 169 above were materially false and misleading when made because: (1) the Exchange Act Defendants knew—but concealed from investors—that, on May 15, 2018, DXC had accused the Executive Vice President in charge of Global Delivery, DXC's largest division and the group responsible for delivering existing business, of "material misconduct" and a "substantial and willful failure" to render services, yet that Executive Vice President remained in his role until weeks into the second quarter of fiscal year 2019; and (2) DXC's "enhancement" to its "workforce management process" and "actions to optimize our workforce" were primarily workforce reduction quotas designed to optimize earnings, not the Company's workforce, and which the Exchange Act Defendants knew—but concealed from investors—caused serious execution issues in "deliver[ing] existing business" and prevented DXC from "staffing the required labor for new business."

171.    On June 29, 2018, Defendant DXC filed its annual proxy statement, which was signed by Defendant Lawrie. In it, the Exchange Act Defendants claimed that the Company's "performance in fiscal 2018" had "exceed[ed] its external expectations on revenue, profitability, and customer satisfaction" including "stable revenue" and "$1.1 billion of in-year synergies during fiscal 2018 driven by policy harmonization, supply chain, and facilities rationalization." Elsewhere, the proxy statement further discussed the Exchange Act Defendants' "continued focus on customer satisfaction," which was a "key metric" in the Company's executive compensation awards, and stated that that the Exchange Act Defendants' "focus" had "yielded . . . customer satisfaction results that exceeded external expectations" and awarded both Defendants Lawrie and Saleh a "100%" weighting for customer satisfaction.

172.    The Exchange Act Defendants' statements quoted in ¶ 171 above were materially false and misleading when made because, as the Exchange Act Defendants have admitted: (1) DXC had actually "been primarily focused on taking people out" and "more preoccupied with [cost-

cutting] than growth," rather than on "customer satisfaction"; (2) the Exchange Act Defendants knew—but concealed from investors—that, on May 15, 2018, DXC had accused the Executive Vice President in charge of Global Delivery, DXC's largest division and thus the group most responsible for the Company's service levels and customer satisfaction, of "material misconduct" and a "substantial and willful failure" to render services, yet that Executive Vice President remained in his role until weeks into the second quarter of fiscal year 2019; and (3) the Exchange Act Defendants knew—but concealed from investors—that their reckless cost-cutting measures, including quota-driven workforce reductions designed to manage earnings, not the Company's workforce, had caused serious execution issues and had adversely affected "customer satisfaction."

173. On August 7, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the first quarter of fiscal year 2019. During the call, Defendant Lawrie stated that the Exchange Act Defendants would "expand margins while also improving client service levels" through automation, and that DXC was "leveraging artificial intelligence, machine learning and bots . . . to eliminate labor from many processes."

174. Likewise, also during the August 7, 2018 earnings call, Defendant Saleh discussed DXC's continued efforts "to optimize our workforce," stating that the Company had "reduced our total headcount by an additional 3.7% in the quarter . . . driven by automation, overhead rationalization and productivity improvements."

175. Defendants Lawrie and Saleh's statements quoted in ¶¶ 173-74 above were materially false and misleading when made, because the Exchange Act Defendants' reduction in headcount and "eliminat[ion of] labor from many processes" were primarily driven by workforce reduction quotas designed to optimize earnings, not the Company's workforce, and which the Exchange Act Defendants knew—but concealed from investors—had not "improv[ed] client service levels" but instead caused serious execution issues and delayed DXC from bringing on the resources needed to support digital growth.

176. On August 15, 2018, DXC held its annual shareholding meeting. At that meeting, Defendant Lawrie stated, "[t]oday, DXC is a stronger and more versatile leading end-to-end global

1    technology services business that is providing unsurpassed value for our clients, partners and

2    shareholders, along with growth opportunities for our people."

3        177.    Defendants Lawrie's statements quoted in ¶ 176 above were materially false and

4    misleading when made, because DXC was engaged in reckless workforce reductions and other cost-

5    cutting measures that the Exchange Act Defendants knew—but concealed from investors—did not

6    provide "unsurpassed value for our clients" but caused serious execution issues and delayed DXC

7    from bringing on the resources needed to support digital growth.

8        **D.    The Exchange Act Defendants' False and Misleading Statements and**

9        **Omissions Concerning DXC's "Investment in People"**

10       178.    On May 25, 2017, Defendants Lawrie and Saleh participated in DXC's earnings call

11   for the first quarter fiscal year 2018. During that call, Defendant Lawrie stated that DXC was

12   "definitely constrained by the skills" but that "what we are doing is rather than trying to go hire all

13   the staff, we are hiring, we are doing graduate programs then hiring people in and training and re-

14   training the existing workforce, but we are also looking creatively for other ways to gain access to

15   these skills."

16       179.    Defendant Lawrie's statements quoted above were materially false and misleading

17   when made because, as the Exchange Act Defendants have admitted: (1) the Exchange Act

18   Defendants' plan had actually "been primarily focused on taking people out" and "more preoccupied

19   with [cost-cutting] than growth" and (2) as a result of the Exchange Act Defendants' reckless cost-

20   cutting practices, the Exchange Act Defendants knew—but concealed from investors—that they

21   would continue to be "constrained by the skills" and unable to "gain access to these [necessary]

22   skills" to serve clients and expand revenue.

23       180.    On August 8, 2017, Defendants Lawrie and Saleh participated in DXC's earnings call

24   for the first quarter fiscal year 2018. During that call, Defendant Lawrie stated that "as a services

25   business, our people are a key pillar of our strategy" and "it's critical that we have the right mix of

26   people with the right skills to serve our clients and to drive innovation and to compete in a very

27   dynamic workplace." Lawrie continued: "We're investing to enhance and increase the skills,

28   knowledge and capabilities of our global workforce," including platforms "to identify and engage

new pools of talent in near real-time . . . enabl[ing] us to bring new people and skills to DXC as we need them." Later in the call, Lawrie stated that while "[w]e're executing fairly expeditiously" on the synergies, the Exchange Act Defendants were also "investing in training and re-skilling our people. So I don't want anybody to think this is just about taking costs out."

181.    On the same call, Defendant Saleh discussed "continuing to use automation as an opportunity to just really drive greater efficiencies in our labor force."

182.    Defendant Lawrie and Saleh's statements quoted in ¶¶ 178-81 above were materially false and misleading when made because, as the Exchange Act Defendants have admitted: (1) the Exchange Act Defendants' plan had actually "been primarily focused on taking people out" and "more preoccupied with [cost-cutting] than growth" or "efficiencies" and (2) as a result of the Exchange Act Defendants' reckless cost-cutting practices, the Exchange Act Defendants knew—but concealed from investors—that they were unable to cultivate "the right mix of people" or "efficiencies in our labor force" to "serve [DXC's] clients."

183.    On November 7, 2017, Defendants Lawrie and Saleh participated in DXC's earnings call for the second quarter fiscal year 2018. During that call, Defendant Lawrie stated that "We also continue to focus on the most important asset for a services organization, our people." Lawrie later discussed DXC's "crowd sourcing platform that enables us to bring new people and skills to DXC in a more flexible way."

184.    On the same call, Defendant Saleh said that "improvement in our margin reflects cost actions we're taking to optimize our workforce" including "reduc[ing] labor by about 4% in the quarter through a combination of automation, best shoring and pyramid correction." Saleh also stated that DXC "continue[s] to rebalance our skill mix, including the addition of almost 4,800 new employees and the ongoing retraining of the existing workforce."

185.    Defendant Lawrie and Saleh's statements quoted above were materially false and misleading when made because, as the Exchange Act Defendants have admitted: (1) the Exchange Act Defendants' plan had actually "been primarily focused on taking people out" and "more preoccupied with [cost-cutting] than growth" and (2) as a result of the Exchange Act Defendants'

reckless cost-cutting practices, the Exchange Act Defendants knew—but concealed from investors—that they were unable to "rebalance [DXC's] skill mix" to serve clients and expand revenue.

186.    On February 8, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the third quarter fiscal year 2018. During that call, Defendant Lawrie stated, "I think the investment we're making in reskilling our people are all critical factors in helping to expand the revenue payment" and that "[w]e are definitely attracting now some really good talent in the cyber business." Lawrie also said that DXC was "reshaping [its] capabilities relative to what clients are looking for," which was "allowing us to respond and scale, and scale" and further that DXC was "going to run a lot of the same plays that we ran this year," including specifically "ramping up our investment in digital skills, both the retraining of our people as well as the recruiting of our people[.]"

187.    Also during the February 8, 2018 earnings call, Defendant Saleh stated that DXC had "continue[d] to rebalance our skill mix, including the addition of 5,300 new employees and the ongoing retraining of the existing workforce."

188.    Defendant Lawrie and Saleh's statements quoted in ¶¶ 183-87 above were further materially false and misleading when made because, as the Exchange Act Defendants have admitted: (1) the "same plays that [the Exchange Act Defendants] ran this year" had actually "been primarily focused on taking people out" and "more preoccupied with [cost-cutting] than growth," which the Exchange Act Defendants understood—but concealed from investors—undermined the Company's ability to "expand the revenue payments" because "there is some trade-off between revenues and cost"; and (2) as a result of the Exchange Act Defendants' reckless cost-cutting practices, the Exchange Act Defendants knew—but concealed from investors—that they were unable to "rebalance" the Company's "skill mix" sufficiently to "respond" "to what clients are looking for" and "expand the revenue payment[s]" on the Company's digital business.

189.    On February 28, 2018, DXC issued a press release that stated, among other things, that DXC was "empowering our workforce by investing in our people, driving a cultural shift and elevating skillsets to ensure that DXC has the right digital-generation talent to optimally meet current and future clients' needs" and that DXC could "quickly build and deliver partner-engineered, at-scale, repeatable offerings and solutions that help drive client digital transformations."

190.    Defendant DXC's statements quoted in ¶ 189 above were materially false and misleading when made, because as a result of the Exchange Act Defendants' reckless cost-cutting practices, the Exchange Act Defendants knew—but concealed from investors—that they could not attract and retain the "right digital-generation talent to optimally meet current and future clients' needs."

191.    On or about April 17, 2018, DXC made publicly available a presentation delivered to investors during March 2018, entitled "Leading our clients' digital transformations [-] DXC Technology Corporate Overview." Among other things, this presentation told investors that DXC was "different" in part because of its "World-Class Talent," stating, "We are investing to attract and upskill the talent who will lead global business tomorrow." The presentation also stated that the Exchange Act Defendants had "[d]eep experience in digital solutions" and purported to have tens of thousands of qualified digital employees. The presentation also promised DXC's "continued investment to upskill and attract next-level talent," with "22K+ certifications completed in FY16." Finally, the presentation also quoted Defendant Lawrie as stating, "Our clients are facing major disruptive changes. We're meeting these challenges with highly talented people, an experienced hand and an independent view of technology solutions[.]"

192.    The Exchange Act Defendants' statements quoted in ¶ 191 above were materially false and misleading when made because, as a result of DXC's reckless cost-cutting measures the Exchange Act Defendants knew—but concealed from investors—the Company could not "attract and upskill" the "highly talented people" needed to support the Company's digital growth.

193.    On May 24, 2018, Defendant DXC issued a press release, filed on Form 8-K, announcing its fourth quarter and full fiscal year 2018 earnings. That press release quoted Defendant Lawrie as stating that the Exchange Act Defendants had "successfully executed on our strategic roadmap" over the past year and that DXC "continue[s] to invest in our digital capabilities and strategic partnerships."

194.    Defendants DXC and Lawrie's statements quoted in ¶ 193 above were materially false and misleading when made because, as the Exchange Act Defendants have admitted: (1) the Exchange Act Defendants' plan had actually "been primarily focused on taking people out" and

"more preoccupied with [cost-cutting] than growth," rather than "invest[ing] in our digital capabilities"; and (2) the "successful[] execut[ion]" of the Exchange Act Defendants' "strategic roadmap" actually involved reckless cost-cutting measures that the Exchange Act Defendants knew—but concealed from investors—prevented the Company's from sufficiently obtaining the "digital capabilities" needed to support the Company's digital growth.

195.    On May 24, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the fourth quarter and full fiscal year 2018. During that call, Defendant Lawrie said that the Exchange Act Defendants were making a "major investment . . . in our people. We're continuing to invest very heavily in the retraining and reskilling of employees." Lawrie further stated that the Exchange Act Defendants would "continue to focus on . . . our ability to more accurately predict what skills we're going to need, how many we're going to need, how we source them." Lawrie continued, "the reskilling of our people is a key priority [for] our whole digital initiative as we continue to want to increase the percent of revenue that we get from digital to offset the natural headwinds we have in the ITO business, some of the other legacy businesses[.]"

196.    Likewise, during the May 24, 2018 call, Defendant Saleh stated that DXC had "continued to rebalance our workforce . . . including the hiring of roughly 20,000 new employees during the year with a significant focus on digital capabilities."

197.    Defendants Lawrie and Saleh's statements quoted in ¶¶ 195-96 above were materially false and misleading when made, because, as a result of the Exchange Act Defendants' reckless cost-cutting measures, the Exchange Act Defendants knew—but concealed from investors—that the Company could not "rebalance" the DXC's workforce sufficiently to "increase the percent of revenue that we get from digital to offset the natural headwinds we have in the ITO business, some of the other legacy businesses."

198.    Also during that May 24, 2018 earnings call, Defendant Lawrie assured investors, "the key point here is we are investing back in the business. So this is not just about taking cost out."

199.    Defendant Lawrie's statement quoted in ¶ 198 above was materially false and misleading when made because, as the Exchange Act Defendants have admitted: (1) in fact, the Exchange Act Defendants had actually "been primarily focused on taking people out" and "more

preoccupied with [cost-cutting] than growth"; and (2) the Exchange Act Defendants were engaged in reckless cost-cutting measures that they knew—but concealed from investors—delayed DXC from bringing on the resources needed to support digital growth.

200.    On May 29, 2018, DXC filed its Form 10-K for fiscal year 2018, which was signed by Defendants Lawrie and Saleh. In the Form 10-K, DXC stated as a "Fiscal 2018 Highlight" that it had "rebalanced our skill mix, including the addition of more than 18,000 new employees and the ongoing retraining of the existing workforce."

201.    DXC's statements quoted in ¶ 200 above were further materially false and misleading when made because the Exchange Act Defendants were engaged in reckless cost-cutting measures that they knew—but concealed from investors—frustrated the Company's efforts to "rebalance" and "retrain" the Company's "skill mix" as needed to support the Company's digital growth.

202.    On August 7, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the first quarter of fiscal year 2019. During the call, Defendant Lawrie stated that DXC "continue[s] to invest in the business and in attracting and developing our digital workforce," describing "digital boot camps where employees as well as our client executives are provided training" and "investing to scale our digital General Manager capabilities." Lawrie further stated that DXC is:

> investing in our digital centers in the U.S., the U.K. and other countries. We're hiring into our global delivery centers and leveraging our graduate program to continuously refresh our talent base . . . . We're making a huge commitment to hiring graduates globally. We'll hire somewhere between 3,000 and 5,000 graduates this year . . . training . . . [and] deploying [them] along many of these digital solution opportunities . . . .
>
> [W]e're building career paths with -- for these graduates that come in. . . . The digital business, much more onshore, much more customer intimate, and we're making big investments in those centers. Not only the centers themselves but then in the hiring and re-skilling of people that we have to deploy against those opportunities.

203.    Likewise, during the August 7, 2018 earnings call, Defendant Saleh stated that DXC had "hired more than 6,000 new employees to support our continued shift to digital and drive location mix and pyramid improvements." Saleh further stated, "I also want to tell you that we're reinvesting in the business. It's not just about cost reduction. We are -- as we mentioned, across the way, we're

putting quite a bit of investment in our digital transformation ourselves and up-skilling our employee base and also training them and also attracting new talent[.]"

204.    Defendants Lawrie and Saleh's statements quoted in ¶¶ 202-03 above were materially false and misleading when made because, as the Exchange Act Defendants have admitted: (1) in fact, the Exchange Act Defendants had actually "been primarily focused on taking people out" and "more preoccupied with [cost-cutting] than growth"; and (2) the Exchange Act Defendants knew—but concealed from investors—that their reckless cost-cutting measures undermined the Company's investments to attract and train the talent needed to support the Company's digital growth.

205.    On August 15, 2018, DXC held its annual shareholding meeting. At that meeting, Defendant Lawrie stated that the Exchange Act Defendants were "building on the momentum established during the first 16 months with a focus on a number of key areas," including DXC's "continued shift to digital" and "continuing to invest in our people." Lawrie continued, "[W]e're continuing to ramp up training and certification programs and are recruiting people with the right next-gen skills."

206.    Defendants Lawrie's statements quoted in ¶ 205 above were materially false and misleading when made because, as the Exchange Act Defendants have admitted: (1) DXC's "momentum established during the first 16 months" had actually "been primarily focused on taking people out" and "more preoccupied with [cost-cutting] than growth," which the Exchange Act Defendants knew—but concealed from investors—undermined the Company's ability to "recruit[] people with the right next-gen skills"; and (2) as a result of the Exchange Act Defendants' reckless cost-cutting measures, the Exchange Act Defendants knew—but concealed from investors—the Exchange Act Defendants could not train and "recruit[] people with the right next-gen skills" as needed to "continue[] [the] shift to digital."

**E.    The Exchange Act Defendants' False and Misleading Statements and Omissions Concerning DXC's Digital Growth**

207.    During the Company's February 8, 2018 earnings call, Defendant Lawrie stated that "Cloud revenue was up 13% year-over-year, and book-to-bill in the quarter was 1x," and spoke generally of Cloud's importance to the Company's pivot to growth through digital, stating that the

1    Exchange Act Defendants "have been a little more successful than we had planned in terms of

2    offsetting the decline in the legacy infrastructure business. We've been more successful offsetting

3    that with cloud and some of our other digital offerings. So that has gone, in all candor, a little better

4    than what we had modeled and what we had communicated . . . . I mean, we're seeing 24%, 25%

5    growth in our enterprise cloud apps business."

6    208.    Defendant Lawrie's statements quoted in ¶ 207 above were materially false and

7    misleading when made because just months earlier, in December 2017, DXC had re-classified certain

8    work done by the Company's Consulting group as part of the Company's Cloud offering in a

9    deliberate effort to manipulate the impression of the Company's digital business.

10   **F.       The Exchange Act Defendants Overstated the Value of the Company's Largest**

11   **Asset**

12   209.    On August 9, 2017, DXC filed its Form 10-Q for first quarter fiscal year 2018, which

13   was signed by Defendants Lawrie and Saleh. In it, DXC reported "Goodwill" of $8.774 billion,

14   making it the largest asset on the Company's balance sheet. Of that total, over 77% came from the

15   $6.765 billion in goodwill recognized from the acquisition of HPE by CSC (which created DXC),

16   which itself was over 68% of the purchase price of $9.85 billion. The Company stated that this

17   goodwill "was attributable to the synergies expected to be achieved by combining the businesses of

18   CSC and HPES, expected future contracts and the acquired workforce. The cost-saving opportunities

19   are expected to include improved operating efficiencies and asset optimization."

20   210.    On November 8, 2017, DXC filed its Form 10-Q for second quarter fiscal year 2018,

21   which was signed by Defendants Lawrie and Saleh. In it, DXC reported that "Goodwill" had

22   increased by $384 million, to $9.158 billion, still the largest asset on the Company's balance sheet.

23   This increase in Goodwill in part reflected the Company's $312 million increase in goodwill it

24   recognized from the HPE acquisition, now $7.077 billion—71% of the HPE purchase price—as a

25   result of "a number of refinements to the . . . purchase price allocation," including an increase in

26   liabilities of $226 million from a "valuation adjustment for outsourcing and other customer contracts

27   taking into account continuing performance obligations." The Company again ascribed the goodwill

28   from the HPE merger as "attributable to the synergies expected to be achieved by combining the

businesses of CSC and HPES, expected future contracts and the acquired workforce. The cost-saving opportunities are expected to include improved operating efficiencies and asset optimization."

211.    On February 9, 2018, DXC filed its Form 10-Q for third quarter fiscal year 2018, which was signed by Defendants Lawrie and Saleh. In it, DXC reported that "Goodwill" had increased by $162 million, to $9.32 billion, still the largest asset on the Company's balance sheet. This increase in Goodwill in part reflected the Company's $131 million increase in goodwill recognized from the HPE acquisition, now $7.208 billion—73% of the HPE purchase price—as a result of "a number of refinements to the . . . purchase price allocation," including an increase in liabilities of $343 million from a "valuation adjustment for outsourcing and other customer contracts taking into account continuing performance obligations." The Company again ascribed the goodwill from the HPE merger as "attributable to the synergies expected to be achieved by combining the businesses of CSC and HPES, expected future contracts and the acquired workforce. The cost-saving opportunities are expected to include improved operating efficiencies and asset optimization."

212.    On May 29, 2018, DXC filed its Form 10-K for fiscal year 2018, which was signed by Defendants Lawrie and Saleh. In it, DXC reported that "Goodwill" had increased by $332 million, to $9.652 billion, still the largest asset on the Company's balance sheet. This increase in Goodwill in part reflected the Company's $184 million increase in goodwill it recognized from the HPE acquisition, now $7.392 billion—75% of the HPE purchase price—as a result of "a number of refinements to the . . . purchase price allocation," including an increase in liabilities of $436 million from a "valuation adjustment for outsourcing and other customer contracts taking into account continuing performance obligations." The Company again ascribed the goodwill from the HPE merger as "attributable to the synergies expected to be achieved by combining the businesses of CSC and HPES, expected future contracts and the acquired workforce. The cost-saving opportunities are expected to include improved operating efficiencies and asset optimization."

213.    On August 8, 2018, DXC filed its Form 10-Q for first quarter fiscal year 2019, which was signed by Defendants Lawrie and Saleh. In it, DXC reported that "Goodwill," now $7.451

billion[8], was 25% of the Company's assets and still the largest asset on the Company's balance sheet. As in the 2018 Form 10-K, the Company allocated as goodwill $7.392 billion of the purchase price of the HPE merger; thus, even after subtracting the $2.0 billion of that goodwill that DXC had allocated to the now spun-off USPS operating segment, goodwill from the HPE merger still amounted to 72% of the Company's total goodwill.

214. DXC's statements quoted in ¶¶ 209-13 above were materially false and misleading when made because a substantial amount of the Company's Goodwill related to the over $7 billion in goodwill that the Company acquired from the HPE merger that created DXC, which the Company attributed to "cost-saving opportunities" and "expected synergies" but which the Exchange Act Defendants knew—but concealed from investors—were actually reckless cost-cutting measures, including quota-driven workforce reductions designed only to manage earnings, that had already caused and would continue to cause serious execution issues and delay DXC from bringing on the resources needed to support its promised digital growth. As a result, throughout the Relevant Period, the Company overstated the value of the Company's Goodwill, the largest asset on its balance sheet.

## IX. THE TRUTH EMERGES

### A. The Truth Emerges as the Exchange Act Defendants Reveal an Enormous Revenue Shortfall and Issue Revised Guidance Showing Decline, Not Growth

#### 1. The October 24, 2018 Corrective Disclosure

215. On October 24, 2018, *The Register* published an "exclusive" article titled "DXC axes Americas boss amid latest deck chair musical."[9] Citing an internal October 9, 2018 memorandum from Defendant Lawrie, *The Register* article revealed that the Company had abruptly fired the head of its Americas sales force, Puri. Puri had only been hired at DXC in January 2018, and had been touted by Lawrie at the time as "a top-notch senior IT services business leader who has driven growth across multiple industry verticals in the region."

---

[8] As the Company disclosed, the reduction in "Goodwill" reflects its spin-off on June 1, 2018 of the Company's USPS segment into its own entity, Perspecta.

[9] Paul Kunert, <u>DXC axes Americas boss amid latest deck chair musical</u>, THE REGISTER (Oct. 24, 2018, 11:15 AM), https://www.theregister.co.uk/2018/10/24/dxc_axes_americas_boss_amid_latest_deck_chair_musical.

216.    Quoting a DXC insider, the article stated that "DXC is descending into turmoil," and that Lawrie had earlier in October called a "town hall" meeting during which he announced more firings and also "blamed Puri for *a 10 to 15 per cent shortfall in [forecast] revenues*." But, according to the insider, "[t]here is no way Puri can have had any real chance to move the needle in the short time he was in office and this 'revolving door' style of leadership is what goes on at DXC."

217.    Finally, after noting that "*The Register* has often spoken to company sources that were concerned about the impact on serving customers," the article stated, "[o]ne of our sources on this occasion told us 'the company is in chaos as all the cuts are leading to mounting customer complaints.'"

218.    The news caused a rapid drop in DXC's stock price on high trading volume. The Company quickly responded in a Form 8-K filed before the close of business that day, titled "[i]n response to today's movement in the stock of DXC." The Form 8-K stated, "the Company reiterated guidance stated previously of earnings per share of $7.75 to $8.15 for Fiscal 2019, and that it is trending toward the higher end of that range." Later that day, the Company filed another Form 8-K "clarifying the statement issued earlier today in its Form 8-K"—and again reaffirming its guidance.

219.    Notwithstanding the Company's reassurances, the facts reported in *The Register* caused the Company's stock price to plummet 16.3% on high trading volume of 9.5 times its average daily volume, declining from $87.56 per share at the market close on October 23, 2018, to $73.25 at the market close on October 24, 2018.

220.    Analysts explicitly linked *The Register* article to the dramatic drop in the Company's stock price. However, analysts mitigated these developments by relying on the Company's prior statements and express reaffirmation of its guidance that day. For example, on October 24, 2018, BMO Capital Markets issued a report stating that while "we believe DXC shares are meaningfully lower today following the publication of an article in the Register[,] [w]e don't know if the content of the article is true." BMO Capital Markets continued to place faith in the Exchange Act Defendants, stating that "*such a steep drop in revenues would be very surprising*, as compared to bookings."

**2.      The November 6, 2018 Corrective Disclosure**

221.    On November 6, 2018, DXC issued a press release, filed on Form 8-K, in which it reported its second quarter fiscal year 2019 earnings. This release revealed that the Company was suffering significant revenue declines across all segments, with overall revenue down 8.1% year-over-year—or more than $440 million. The Company attributed the overall decline to "a stronger dollar, completion of several large transformation projects, and slower ramp-up on a few large Digital contracts," while stating that declines in Global Business Services were "primarily driven by a decline in the traditional application maintenance and management business" and declines in Global Infrastructure Services "reflect[ed] the timing of client migrations from traditional to cloud environments."

222.    The Exchange Act Defendants discussed the revenue decline further during an earnings call held after the close of business on November 6, 2018. Lawrie admitted that "revenue was down 6.2% year-over-year and roughly $200 million below our expectations for the quarter." Lawrie attributed this $200 million revenue shortfall to two "primary causes": 1) approximately $100 million from a "slower ramp-up on a few large Digital contracts"; and 2) approximately $80 million from "a decline in our application and maintenance management business," "particularly in the Americas," which Lawrie stated was down "about 3.5% year-over-year."

223.    During that call, the Exchange Act Defendants also unexpectedly announced that, as a result of the revenue shortfall, the Company was reducing revenue guidance for the fiscal year by approximately $800 million, now projecting revenue of $20.7 billion to $21.2 billion. Thus, rather than the stabilization and growth that the Exchange Act Defendants had promised investors during the Relevant Period, even the high range of the Exchange Act Defendants' revised revenue guidance was still half a billion dollars *below* their fiscal year 2018 performance.

224.    The Exchange Act Defendants attributed this revenue guidance reduction to the $200 million revenue shortfall that quarter as well as an additional $300 million in "revised phasing" of contracts, as well as $300 million in currency headwinds.

225.    To explain the $100 million revenue miss in "slower ramp-up" and the $300 million "revised phasing" on digital that drove the guidance reduction, Lawrie revealed for the first time,

that "it is taking us longer than expected to *bring on resources to support the digital growth*." While Lawrie had initially blamed some of the miss by claiming that "[s]everal clients were also behind in scaling their digital transformations," later in the call he admitted that was not the case: "[t]here's no question there's demand . . . when you see the bookings and you see that sequential growth in bookings, this isn't an issue with demand. *It's an issue of being able to satisfy that demand*." Instead, Lawrie confessed that he had "run our workforce and labor programs very tightly, very tightly," and as a result they "had a very thin bench"—in other words, despite having promised throughout the Relevant Period that the Exchange Act Defendants were on top of their workforce, Lawrie now revealed that the Exchange Act Defendants did not have enough people to service demand and needed to "accelerate our hiring."

226.    The news surprised investors. For example, while Defendant Lawrie seemed to indicate that the Exchange Act Defendants only now "recognize . . . there is substantial demand for digital skills" such that they needed to "hire ahead . . . of the demand," in fact the Exchange Act Defendants had previously told investors that they *had already done so*. Throughout the Relevant Period, the Exchange Act Defendants told investors that they were hiring tens of thousands of new employees with a "significant focus on digital capabilities," and further that the Company had "enhanced our workforce management processes to cost-effectively deliver existing business while *staffing the required labor for new business*."

227.    The second "primary cause" of the Company's poor results according to Defendant Lawrie was "a decline in our application and maintenance management business," to which he attributed approximately $80 million of the revenue miss. Lawrie explained the miss by stating neutrally that it "was largely driven by a reduction in application maintenance spend in several large accounts, particularly in the Americas, including HPE, as these clients remixed their IT investments"—something that Lawrie claimed he "didn't see" coming,[10] driven by clients beginning "to contemplate upgrades to some of their systems," but who "scal[ed] back on the maintenance of those existing systems." Lawrie continued: "[a]nd that did cause some of the shortfall, I think it was

---

[10] Defendant Lawrie did concede that "[m]aybe Paul [Saleh]" saw this development coming.

about $80 million, particularly in the U.S. where we're seeing some substantial plans to upgrade some of the big application platforms that our large clients have." At another point, Defendant Lawrie admitted that the $80 million shortfall related to "some execution issues" and that, "in this business, when you miss by $80 million in our application maintenance business in the second quarter, you don't make that up. You don't make that up. *Now what you do is you fix the execution* . . . ."

228.   The news that DXC's revenue suffered from execution issues caught investors off guard—as noted above, Defendant Lawrie had taken pains to emphasize customer satisfaction in prior communications to investors, and indeed the Individual Exchange Act Defendants' over $50 million in combined compensation for fiscal year 2018 in part related to supposed "100%" performance on "customer satisfaction."

229.   Finally, Defendant Lawrie implicitly blamed departing Americas executive Puri for execution issues, stating that the Exchange Act Defendants had "made leadership changes in both our Americas region and global application services business" as part of their "steps to improve performance in these businesses." Lawrie continued, "we went to a generalist sales model in the United States. And after watching that for 2 quarters, I concluded that wasn't the right approach. And the reason for that is we were missing some of the add-on work that we would get by having deployed a more specialized application sales force. So we have corrected that. And we've gone back, and we've put that dedicated application sales force in place, which will allow us to pick up on some of those incremental add-on projects that we didn't get, particularly in the second quarter."

230.   This revelation again surprised investors, because during the Relevant Period, the Exchange Act Defendants had indicated to investors that they were doing exactly that, stating that they were attempting to "ignite" sales through specialized sales teams, with "one team responsible for the legacy or the run environments that we have, and then a separate team that is focused, in many cases, on disintermediating and driving digital platform growth."

231.   The market reacted negatively—the Exchange Act Defendants had not only confirmed the worst revelations of *The Register* article, but revealed that the Company's problems were even more widespread and worse than feared. In an analyst report issued that day, Deutsche Bank wrote that "DXCs 2Q19 results confirmed the revenue weakness highlighted in the recent

1    *Register* article, as DXC was forced to cut revenue guidance[.]" Likewise, in its report that day, BMO

2    Capital Markets wrote, "Against Low Expectations, Top Line Is Disappointing . . . Though we had

3    trimmed our estimates on November 1, our revisions were not enough."

4         232.   Similarly, the following day, J.P. Morgan issued an analyst report stating, "While

5    weak revenue is not new at DXC, high magnitude of miss could further pressure the stock today" as

6    "investors' expectations of organic revenue growth turning around could get pushed out a bit." The

7    report also refuted the Exchange Act Defendants' halfhearted attempts to blame client demand,

8    stating, "We believe IT services demand environment remains healthy, and DXC's weakness

9    stemmed from company specific execution challenges (IBM Services revenue had improved in

10   C3Q)."

11        233.   Over the following day, the price of DXC stock declined 12.46% on high trading

12   volume, from a close of $72.21 per share on November 6, 2018 to a close of $63.21 per share on

13   November 7, 2018.

14                 **3.      The August 8, 2019 Corrective Disclosure**

15        234.   The October and November 2018 revelations rocked the investment community and

16   caused material declines in DXC's share price, but unbeknownst to Plaintiff and other investors, the

17   full extent of the devastation had yet to be revealed, and therefore the artificial inflation had yet to

18   be fully removed from DXC's share price.

19        235.   In fact, DXC continued to obfuscate the full extent of the issues plaguing the

20   Company's growth prospects. For example, during the Q4 2019 Earnings Call held on May 23, 2019,

21   Lawrie explained how DXC fundamentally achieved sequential growth in digital business that

22   outpaced sequential decline in traditional business:

23          Well, actually, I mean, these are rough numbers, so these are not audited by -- but the
            -- ***fundamentally, we crossed over this quarter. So our sequential growth in digital***

24          ***was greater than our sequential decline in the traditional business. So that***
            ***happened this quarter.*** And on a year-over-year basis, we -- I think this quarter now

25          it's just like $30 million or $40 million, which fundamentally is at that point. Now,
            what I'm saying is as we go through next year that will be lumpy. And the reason that

26          is lumpy is each quarter slightly differ. Some quarters you have a little more revenue
            run or you have a discontinuance or you have a price down, so it is -- you can't say,

27          okay, gee, crossed here in the fourth quarter. Therefore, it's over. No, no, this is great.

28

***We have narrowed this gap dramatically, dramatically in the last year, last year and a half.*** Now we're going to see some ups and downs as we go through the typical seasonality and the unique quarter layout of the revenue stream.

236.    At bottom, Lawrie's statements conveyed that DXC's over time digital growth could make up for declines in tradition and that the Company had reached an inflection of sorts. These statements later proved materially misleading and false.

237.    On August 8, 2019, after the market closed, the Company lowered its fiscal 2020 guidance, expecting revenue between $20.2 billion and $20.7 billion, representing a $500 million shortfall from the already disappointing previously-issued guidance. Rather than the stabilization and growth that the Exchange Act Defendants had promised investors during the Relevant Period, even the high range of the Exchange Act Defendants' revised revenue guidance was still one billion dollars ***below*** their fiscal year 2018 performance.

238.    On this news, the Company's share price fell $15.74, or over 30%, to close at $35.91 per share on August 9, 2019, on unusually heavy trading volume.

239.    After the illusory, short-term benefits of the extreme workforce reduction plan had dissipated, and it had become clear that the short-sighted strategy backfired, DXC changed its leadership. On September 11, 2019, DXC announced Defendant Lawrie's retirement as DXC's President and CEO and the appointment of Mike Salvino as his replacement, effective immediately.

240.    On November 11, 2019, DXC issued a press release announcing disappointing financial results for second quarter 2020. The Company achieved diluted EPS of –$8.19, compared to $0.92 in the prior year second quarter. Revenues also declined year-over-year by 3.2%. In addition, the Company revised its 2020 annual revenue guidance downward from a range of $20.2-$20.7 billion to a range of $19.5-$19.8 billion.

241.    During Salvino's first earnings conference call as DXC's CEO on November 11, 2019, he tacitly acknowledged the foregoing service delivery and personnel retention problems, which directly resulted from his predecessor's workforce reduction plan:

(a)    "[W]e will invest to ***stabilize key accounts and ensure that our delivery is meeting our clients' expectations***."

(b)   "We need to focus more on our people and strengthening our employee value proposition. Our people need to be clear about their career path at DXC, the opportunities to work with new clients, and also the opportunities for rescaling and retraining. Being clear about these items will help create an environment where people are acknowledged, recognized and rewarded, which will *improve employee satisfaction and increase retention*."

(c)   "*[E]xecution challenges from recent delivery actions have negatively impacted some of our large customers, which results in lower margins, delayed revenue and bookings as customers have placed the additional work on hold.* We have recovery plans under way for these accounts, but we need to do a better job running operations. By doing this, we will earn the right to expand our footprint with customers."

(d)   "This [downward] revised revenue guidance is driven by three primary factors. . . . Second, *due to execution at existing customers, we now expect $250 million less revenue this year. $75 million of that amount is due to certain customers placing revenue opportunities on hold. This was due to recent delivery execution issues*. Now we have recovery plans under way to improve service levels on these accounts. We also adjusted our revenue outlook by $175 million to reflect potential disruptions given the announcement that we are pursuing strategic alternatives for three of our businesses."

242.   In truth, according to the Hilton Complaint, media reports that came out in October 2018, and the CAC in the *In re DXC* Action, former employees have revealed that throughout the Relevant Period, the Exchange Act Defendants knowingly misrepresented DXC's purported transformation.

X.   **SCIENTER ALLEGATIONS**

A.   **DXC's Former Head of Global Delivery Exposes the Exchange Act Defendants' Deception**

243.   In February 2019, Stephen J. Hilton, formerly a senior member of DXC's management team who reported directly to Lawrie and was a candidate to replace Lawrie as CEO in the Company's formal "succession plan," filed a breach of contract lawsuit against DXC in federal court. The Hilton Complaint exposes numerous incidents and circumstances that support and

corroborate the knowing falsity of the Exchange Defendants' Relevant Period misstatements and omissions. Hilton started his career at CSC as a service delivery executive, technical architect, and business development/sales director. After leaving in 2003, he spent the next twelve years in management-level roles at JP Morgan Chase and Credit Suisse.

244.    According to the Hilton Complaint, Hilton was personally hired by Lawrie in early 2015 as Executive Vice President and General Manager for CSC's Global Infrastructure Services. While at CSC, Hilton's division had an annual P&L of $4 billion and employed approximately 15,000 people worldwide. Between May 2016 and April 2017, Hilton alleged that he was one of a "small set of CSC executives who had to both run CSC and orchestrate the merger" with HP.

245.    As discussed above, after the Merger, Lawrie, as CEO of DXC, organized the operations structure of the newly formed company into a novel structure consisting of three functional divisions: "Build," "Sell" and "Deliver." "Deliver" was headed by Hilton, who was given the title Executive Vice President, Head of Global Delivery. This role greatly expanded Hilton's responsibilities such that he now managed approximately 120,000 DXC employees and 60,000 contractors worldwide, and had a total expense base of $14 billion across 6,000 clients and 70 countries. As noted in the Company's June 29, 2018 proxy statement, Hilton was one of the five top named executive officers of DXC. Notably, the heads of each of the three main divisions, including Hilton, all departed DXC within 15 months after the Merger.

246.    The Hilton Complaint details how (a) Hilton warned Lawrie that the pace of DXC's cost cuts through primarily massive layoffs and other cuts would have direct "negative impacts on customer satisfaction;" (b) Lawrie engaged in a reckless campaign to force out experienced, highly valuable management and senior employees in order to avoid paying millions of dollars in compensation that could be added to the Company's bottom line; and (c) Lawrie touted DXC's successful completion of its revenue roadmap and continued focus on the "quality" and "productivity" of delivery in May 2018, days after secretly informing Hilton of his likely termination based on the poor performance of his division, failure to deliver on promised cost cuts, and poor customer relations.

1                     **1.**      **CSC's Pre-Merger Cuts**

2           247.     Even before the Merger was completed, Hilton had already made significant cuts at

3 CSC. When Hilton became the head of CSC's GIS in March 2015, the division had been missing its

4 internal budget targets by hundreds of millions of dollars per year. These targets were generally set

5 by Defendant Lawrie. Hilton immediately began cutting costs within GIS in an effort to bring the

6 division within its budget targets, including by canceling programs and creating operational

7 efficiencies. Throughout 2015 and 2016, CSC's board of directors was contemplating a merger with

8 several potential partners, including HPES. For this reason, cutting costs and increasing profitability

9 was important for purposes of finalizing a favorable merger transaction. Nonetheless, illustrating the

10 severity of Lawrie's demanded cuts, GIS missed its internal budget targets in 2015 and 2016.

11                    **2.**      **DXC's Harmful Implementation of Its Extreme Workforce Reduction**

12                        **Plan**

13           248.     As part of the planning and organization process leading up to the Merger, Defendant

14 Lawrie told Hilton that he wanted to achieve major cuts to DXC's total expenses. That primarily

15 meant reducing the number of personnel. Because most of DXC's personnel were located in Global

16 Delivery, most of the Company's workforce cuts would have to occur within that division. Critically,

17 the Global Delivery division included DXC's IT Operations, Application Management, and Business

18 Process Services. In other words, this was the division that housed the Company's IT personnel who

19 served clients in the field.

20           249.     Lawrie and Hilton agreed that DXC could ***eventually*** cut the Global Delivery

21 division's annual expenses by approximately $2.7 billion—meaning that the division could spend

22 $2.7 billion less annually than its legacy entities, CSC and HPES, together had spent in the year

23 before the April 2017 Merger. The bulk of these cuts would be obtained through workforce

24 reductions. However, it was also acknowledged that aggressive cuts could cause significant loss to

25 the quality of the service that Global Delivery provided to DXC clients. To preserve quality of

26 service, the Global Delivery cuts would have to be implemented over time.

27           250.     Hilton alleges that he "knew there was no way for Global Delivery to spend $2.7

28 billion less in the first twelve months after the merger than its constituent entities [CSC and HPE]

had spent in the twelve months leading up to the merger" because changes such as firing people and reducing asset-heavy fixed costs "take[] considerable time and accounting efforts." Most importantly, Hilton knew that "it was people employed by Global Delivery who provided customer support to the clients won for DXC by sales" and that *"[p]recipitous cuts in Global Delivery could be disastrous for DXC's long-term revenue, because those cuts would have a direct impact on customer satisfaction, a point routinely expressed to Hilton by his 'Sell' and 'Build' peers*."

251.    Despite these substantial risks and concerns, DXC's internal budget, established by Defendant Lawrie, called for Global Delivery to make approximately $2.7 billion in cuts within the first 12 months after the Merger. As Hilton alleged, to meet this internal budget target, "*Global Delivery would have to fire far more people far more quickly, with the resulting negative impact on customer satisfaction*."

252.    Hilton "*repeatedly advised Lawrie* about his reservations concerning the pace of cuts." Based on these discussions, Hilton believed that "Lawrie understood that workforce reductions could not be achieved at the pace required by his internal budget without *negative impacts on customer satisfaction*." Although these legitimate and material risks were internally discussed at DXC before the Merger, including by Defendant Lawrie and Hilton, they were not disclosed to investors in the Registration Statement.

253.    Moreover, the Hilton Complaint reveals that Lawrie was not dissuaded, describing as an example how Lawrie would "mov[e] the goal posts . . . . In one instance dating to September and October 2017, Lawrie gave Hilton one set of targets for workforce reductions in the U.K. and Ireland region team and in the North Central Europe region team—and then, two weeks later, nearly doubled the size of the expected cuts and said he expected those cuts to happen within just weeks."

254.    Hilton also raised his concerns with Joanne Mason, DXC's head of Human Resources and a close ally of Lawrie. Hilton believed that he should express his concerns because he was the leader of approximately 120,000 people who would be affected by major organizational and workforce decisions. Despite his concerns, Hilton alleges that Mason implemented "chaotic and non-collaborative" processes that led to firing decisions that were "*sub-optimal for the future success of DXC*."

255.    Despite his reservations, Hilton alleges that he complied with Lawrie's directives and Global Delivery's cuts led to "remarkable increases in earnings per share" during the first five quarters after the Merger. In total, Hilton "reduced Global Delivery's workforce by approximately twenty percent worldwide," effectively 24,000 terminations, and achieved "hundreds of millions of dollars of reductions" as a result of those terminations and other reductions in IT expenditures. As described herein, these forced terminations did exactly what Hilton warned of, and led directly to DXC's inability to satisfy and service customer demands and implement new strategies vital to the Company's long-term success.

256.    Despite the fact that Hilton complied with Lawrie's drastic cost-cutting directives— actions that he and Lawrie knew would have negative impact on the Company's long-term success— Hilton was still a victim of Lawrie's other deceptive firing practices employed on the most senior and high-earning employees and executives. Like Lawrie's decision to fire some of the Company's most integral sales and delivery personnel without regard to client needs, these practices were also short-sighted and stripped the Company of some of its most important employees. Hilton alleges that he came to learn that Lawrie "had a pattern of terminating subordinates shortly before their stock grants would vest, finding various ways to avoid paying out compensation that was owed." For example, Lawrie gloated about how much money Hilton's predecessor had "left on the table" when CSC fired him.

257.    According to the CAC in the *In re DXC* Action, Lawrie's practice of firing executives before their stock grants vested has been corroborated by former Company employees. For example, the individual identified in the CAC as FE[11]-1, DXC's Chief Technology Officer for the Americas region from April 2017 through January 2018, stated that DXC let him go several months before $1.5 million in options vested, and further confirmed that he had heard anecdotally that Lawrie would regularly terminate senior people before their stock vested.

---

[11] "FE" refers to "Former Employee." All FE allegations are taken from the Consolidated Class Action Complaint in *In re DXC Technology Company Securities Litigation*, No. 18 Civ. 1599 (E.D. Va.) (ECF No. 50). All former employees' roles are delineated and established in Appendix A to that Complaint.

258.   Hilton alleges that he fell victim to Lawrie's improper compensation manipulation when, as Hilton himself fell out of favor with Lawrie, Lawrie called Hilton into a meeting on May 15, 2018, and presented him with a letter providing grounds for Lawrie's termination for "Cause." Hilton argues that the impact of the for "Cause" termination unlawfully deprived him of nearly $15 million of vested options and grants—money that could be added to the Company's profits. The May 15 Letter, which was attached to the Hilton Complaint, expressed Lawrie's "dissatisfaction with [Hilton's] performance as a leader of DXC," including his "failure to achieve over $1 billion" of the cost cuts that he had been tasked with—cuts that Hilton had explicitly warned would harm the Company. Lawrie gave Hilton 60 days to remedy his "material misconduct" and "substantial and willful failure to render services."

259.   Less than ten days later, on May 24, 2018, Lawrie spoke to investors at DXC's quarterly earnings call. Lawrie not only failed to disclose that DXC had just accused the Executive Vice President in charge of its largest division of "material misconduct" and a "substantial and willful failure" to render services, he boasted that the Exchange Act Defendants had "really successfully completed the overall year 1 integration road map for DXC," "track[ed] a bit ahead of plan on revenue," and that "[p]rofit during the first year was also better than expected as we were able to accelerate many of the cost takeout synergies, including reduced management layers and global deployment of our automation program, Bionix"—Hilton's own product. Lawrie also reported that "we achieved [] key merger integration milestones and exceeded our synergy targets" by achieving $1.1 billion in cuts, more than the projected $1 billion target. Further, Lawrie emphasized that "Our delivery teams continued to drive increased productivity while improving service levels for our clients." These statements were in direct conflict with the concerns expressed in the May 15 Letter to Lawrie, and concealed from the public that one of the top executive leaders of the Company was effectively fired for "Cause" based on poor performance over the previous year.

260.   The Hilton Complaint alleges that following the May 15 Letter, DXC secretly altered the vesting dates on millions of dollars' worth of Hilton's options to a date just beyond the 60-day cure date provided for in the May 15 Letter. According to Hilton, DXC's Compensation Committee acted as nothing more than "a rubber stamp for Lawrie" and exercised no meaningful oversight of

this decision to change the vesting dates. Notably, while DXC's June 29, 2018 proxy statement, issued two weeks before his termination, noted that Hilton was awarded no fiscal 2018 annual cash incentive award based on poor performance of the Company's largest division, the Compensation Committee approved massive incentive awards to Defendants Lawrie and Saleh of $5 million and $1.58 million, respectively, for "successfully driving and executing the company's post-merger business."

261.    Hilton was formally fired by Lawrie on July 17, 2018. Hilton alleges, based on his experience at CSC and DXC, and his knowledge of other, similar examples, that the true reason Lawrie terminated Hilton for "Cause" was to prevent Hilton from receiving well over $20 million in compensation that was due to him through stock options and his severance agreement.

**B.      Former Employees Corroborate that the Exchange Act Defendants Made "Chaotic" and "Sub-Optimal" Firing Decisions**

262.    According to the CAC in the *In re DXC* Action, numerous former employees have corroborated Hilton's allegation that the Company's massive workforce reductions were actually "chaotic and non-collaborative" processes that led to firing decisions that were "sub-optimal for the future success of DXC." In fact, the Company ordered aggressive headcount reductions to meet predetermined expense targets, without regard to the Company's ability to execute—and indeed were informed of the harm it was causing during the Relevant Period.

263.    According to the CAC, the person identified therein as FE-1 was DXC's Chief Technology Officer for the Americas Region from April 2017 until January 2018. During that time, as well as for several years prior at CSC, FE-1 reported to senior executives who themselves reported directly to Defendant Lawrie, including for example former Executive Vice President Mike Nefkens and Chief Technology Officer Dan Hushon.

264.    According to the CAC, FE-1 explained that, as a senior DXC executive, he regularly expected that, the month before the end of each quarter, there would be workforce cuts because Lawrie ordered that another 5% to 10% of the workforce be cut any time the Company looked like it was coming up short on quarterly numbers. FE-1 explained that Lawrie was merciless about these cuts, which were ordered with no real plan or intent. FE-1 disputed the Company's most common

contention, that these cuts were directed at people with redundant functions. Instead, FE-1 stated—consistent with what Hilton states in the Hilton Complaint—the vast majority of the workforce cuts were focused on the Global Delivery organization. However, the customers that those employees were serving still needed to be serviced after employees were fired. As revealed, these cuts prevented DXC from servicing its customers. FE-1 also disputed the Exchange Act Defendants' claims that cuts were being driven by automation, calling them "nonsense." The former Chief Technology Officer for the Company's Americas region estimated instead that any advances in automation could not make up for the workforce cuts, which were made at approximately three times the pace that DXC could deploy automation. Rather, FE-1 said, the cuts were purely a "numbers game"—Lawrie would order the cuts, and the teams had to figure out how to get the work done with the reduced workforce. FE-1 noted that thousands of workforce cuts were ordered in the Americas, even when that region was tracking to growth and other regions were not, because the labor laws in the region allowed firings quick enough to impact quarterly numbers. That the Company specifically targeted the Americas region for workforce reductions due to favorable labor laws—not "optimization"—concealed a risk that materialized when the region suffered massive revenue shortfalls.

265.    According to the CAC, FE-1 said that as a result, the cuts so decimated the Global Delivery division that decades-old relationships began in-sourcing or moving to other players. FE-1 relayed as an example that his own team had been cut by 50%, and that FE-1 and his team received very vocal feedback that DXC clients were unhappy about these cuts because they removed many of the key DXC people that the customers relied on. FE-1 also explained that customers grew upset because some of the enhancements they had been told about did not materialize, and because there were not sufficient personnel to deliver what had been sold to them.

266.    According to the CAC, several other former employees likewise corroborated that the order for headcount reductions would come down from senior management in a "top-down" fashion that did not consider the resulting negative consequences to the Company's ability to execute.

267.    According to the CAC, the person identified therein as FE-2 was a Senior Manager, Global Service Desk—Americas from DXC's inception until March 2018. Prior to the merger, FE-2 had worked at Hewlett-Packard since 1987. FE-2 reported to Greg Betz ("Betz"), DXC's then-

Vice President of Americas Delivery, who in turn reported to Samson David ("David")[12]. Corroborating both Hilton's and FE-1's accounts, FE-2 described how David would receive monthly instructions on how many people had to be laid off in a "top-down" process—meaning a number that was a "a tell, not an ask" that came from corporate headquarters. FE-2 and his peers had frequent discussion with his supervisor, Betz, about how the cuts affected delivery and service. Like FE-1, FE-2 disputed the Exchange Act Defendants' claims that "automation" drove the headcount reductions, explaining instead that managers simply had to roll the dice with the "hope" that automation initiatives "would save the day." According to FE-2, as a result of the cuts, the Global Delivery group "was on pins and needles" when he left in March 2018, with Global Delivery already having significant execution problems.

268.    According to the CAC, the person identified therein as FE-3 was a Senior Finance Manager at DXC from its inception until September 2018, and had worked for over a decade prior at CSC. As Senior Finance Manager, FE-3 was responsible for the finances of the Company's Consulting group. FE-3 worked closely with the Operations Manager for that group, Carlos Lopez-Abadia, and confirmed that the Company would tell managers how many people they needed to lay off to hit a profit target.

269.    According to the CAC, FE-3 also revealed that one deliberate component of the Exchange Act Defendants' expenses-driven approach to "workforce optimization" was an aggressive focus on terminating senior, higher salaried subject matter experts, a process referred to as "greening." FE-3 described how this "greening" in turn accelerated turnover within the Consulting group, explaining that, as the knowledgeable personnel saw their friends getting laid off, they in turn expected to be laid off, so they would preemptively leave. As a result, FE-3 stated, turnover for the Consulting group was 35%—much higher than even the Company's targeted 20%. This high turnover, FE-3 continued, negatively impacted the Company's much-discussed hiring and training efforts, because there were no sufficiently knowledgeable employees to train new recruits.

---

[12] As explained in the Hilton Complaint, David was Hilton's direct report, and to whom the vast majority of the Global Delivery organization reported to.

270.     According to the CAC, the person identified therein as FE-4 was a former Client Sales Executive from the Company's inception until he left in June 2018. FE-4 specialized in defense and intelligence sales and reported to Sean Mullen, then-Senior Vice President at DXC. FE-4 experienced firsthand how the Company's approach to workforce reduction and "greening" removed "mission critical people." Specifically, FE-4 described how DXC's $2 billion contract for the Navy's NGEN ("Next Generation Enterprise Network") was "the crown jewel" of the federal business. However, FE-4 explained, DXC fired experienced employees, which harmed his ability to make sales in the future. FE-4 stated how he was personally told in numerous meetings at the Pentagon that DXC's terrible execution was making "a shit show" out of NGEN and that "nobody fucking trusts you."

271.     Another former employee quoted in the CAC described how the Company deliberately got rid of its "bench" of skilled employees. According to the CAC, the person identified therein as FE-5 worked at DXC from its inception until February 2019 as a Technology Principal Consultant, reporting to Karen Romanello ("Romanello"), who was the practice lead for all of Global Delivery in the data analytics/information management side in any verticals DXC had clients in. FE-5 explained that, prior to merging with CSC, HPE kept employees between projects on "the bench," where they would work with the hiring manager to try and get a new client, sometimes for as long as six months or a year. However, FE-5 explained, the Exchange Act Defendants eliminated "the bench." FE-5 described how DXC's senior leadership sent the practice leads, including his supervisor Romanello, a monthly report of employees who were not actively billable to a client (i.e., those on the "bench"), together with instructions to lay off a certain portion of those employees.

272.     According to the CAC, FE-5 explained that this Company's getting rid of the "bench" not only caused the Company to lose knowledgeable employees, but further impacted the Company by driving insourcing, the practice where DXC's clients would hire fired employees to preserve the employees' knowledge of that clients' systems. Indeed, FE-5 himself now works for the client—Blue Cross and Blue Shield Association—that he had previously serviced for DXC and its predecessors, and which FE-5 revealed that DXC lost in October 2018.

**C.     The Exchange Act Defendants Personally Learned about "Negative Impacts on Customer Satisfaction" from Their Workforce Reductions**

273.    According to the CAC, former employees have also confirmed Hilton's allegation that Defendant Lawrie "understood that workforce reductions could not be achieved at the pace required by his internal budget ***without negative impacts on customer satisfaction***." In fact, the Exchange Act Defendants were specifically confronted with the performance failures caused by their cuts, but nonetheless concealed that information from investors.

274.    Defendants Lawrie and Saleh repeatedly emphasized to investors their personal knowledge of DXC's business and clients, and hands-on approach. For example, DXC stated in its June 29, 2018 proxy statement that "Mr. Lawrie takes an ***active approach*** to overseeing and managing our global operations."

275.    According to the CAC, the person identified therein as FE-6 was Chief Technologist for DXC's Americas Travel and Transportation Industry from the Company's inception to December 2018. In this role, FE-6 both assisted with client delivery and also worked with sales to help close deals. As a result, FE-6 witnessed firsthand how the Company's unending layoffs negatively affected delivery, and also that these delivery failures made it harder to sell the Company's services because customers knew that DXC could not deliver. In addition, FE-6 said, the Company's workforce reductions made it harder and harder to find DXC employees who actually understood the product lines. FE-6 personally heard complaints from customers all the time and that customers were very concerned about the turmoil within the Company, and stated that the Individual Exchange Act Defendants learned firsthand that these cuts were impacting DXC's ability to grow their revenue.

276.    According to the CAC, FE-6 described how, for one of the Company's "key" accounts, United Airlines, which was worth approximately $176 million, DXC caused at least two IT outages, including one that led to a system shutdown. As a result of DXC's performance failures, United Airlines Executive Vice President Linda Jojo demanded to speak with Defendant Lawrie about these deficiencies personally. Ultimately, in October 2018, United Airlines declined to renew a significant amount of its servicing and maintenance contract with DXC due to these service issues. Indeed, Lawrie acknowledged this event at DXC's November 8, 2018 Investor Day, stating that the

Exchange Act Defendants had "made some mistakes" in "maintaining the existing systems. United Airlines doesn't want to hear that we grounded 800 jets because we were trying to integrate a digital project into the existing mainstream IT architecture."

277.    According to the CAC, FE-3 corroborated that the Company's poor service caused by its cost-cuts hurt the Company's contract with United Airlines, and generally stated that Defendants Lawrie and Saleh were aware that their headcount reductions fired employees who supported the contracts and delivered service to the clients.

278.    According to the CAC, the person identified therein as FE-7 was an Account Delivery Lead at DXC from the Company's inception until March 1, 2019. FE-7 described another instance where the Company's "workforce optimization" backfired, causing the Company to drop the ball on FE-7's client, Baker & Taylor, a 30-year legacy CSC customer. Specifically, FE-7 explained that the Company had fired the people with knowledge to configure the storage area network that Baker & Taylor used to store all of their data, including their ordering system. As a result, in or around April 2017, Baker & Taylor's order system went down and could not be restored for days, which FE-7 learned that Baker & Taylor claimed cost it nearly $10 million in lost orders alone. Thereafter, FE-7 revealed, Baker & Taylor threatened a lawsuit, and settlement discussions continued for over a year—i.e., well into the Relevant Period—before DXC finally agreed to pay Baker & Taylor nearly half a million dollars. As a result of this issue and others, DXC lost the ability to capitalize on large opportunities with Baker & Taylor's corporate parent, Follett, who as recently as June 2017 had discussed numerous possible opportunities, none of which were launched with DXC.

279.    According to the CAC, the person identified therein as FE-8 was a Pricing Consultant at DXC from the Company's inception until January 2019, during which time he participated in meetings with Defendants Lawrie and Saleh concerning high-profile deals. FE-8 described how, after 4-5 months of work, the Company in early 2018 had agreed to a strategic, $41 million deal to provide "digital" services to its existing IT client, Mondelēz International, Inc. ("Mondelēz"). In other words, this was exactly the sort of digital transformation that Defendant Lawrie had told investors DXC would pursue. However, the deal collapsed around April 2018 as a result of DXC's continued failure to address issues in its existing service contract. FE-8 had personal conversations with Mondelēz and

the DXC account manager, Pat Vondette, about the failure of this deal, and FE-8 said that Defendants Saleh and Lawrie would have learned of the situation.

280.    According to the CAC, the person identified therein as FE-9 was an Engagement Manager at DXC from the Company's inception until the end of March 2019, working as a delivery manager for the Company's financial services division. FE-9 revealed that, in approximately June or July 2018, one of the clients that he provided service to—MassMutual—cancelled a "BPO" (Business Process Outsourcing) contract that had extended through 2022 and which provided approximately half of the $30 million in annual revenue from the MassMutual account. FE-9 learned directly from MassMutual that the contract was cancelled because DXC was not meeting service level agreements as a result of the layoffs. FE-9 discussed this reason for this cancellation with his superiors, including Ashish Kumar, then-Operations Manager, and that FE-9's understanding was that this would have been discussed further up the chain including to the Individual Exchange Act Defendants.

### D.    The Exchange Act Defendants Knew that They Could Not Bring on the Resources Needed to Support Their Promised Growth

281.    On March 26 and 27, 2019, *The Register* published articles describing a March 19, 2019 internal DXC conference call led by Dean Clemons ("Clemons"), global services leader at DXC's Offering division.[13] During the Relevant Period, the Exchange Act Defendants had bragged repeatedly about the thousands of certifications completed by its employees. *See, e.g.*, ¶ 191. Yet, in March 2019, Clemons admitted that DXC had not been paying for "certs [certifications] that are fundamental to our business" – something that its competitors "do . . . much more grandly than we do."

---

[13] *See* Paul Kunert, <u>DXC Security exec: Yes, I'd have thought we'd spend more on certs and laptop kit for staff, too</u>, THE REGISTER (Mar. 26, 2019, 9:08 AM), https://www.theregister.co.uk/2019/03/26/dxc_security_spending/; *see also* Paul Kunert, <u>DXC: Slashing costs affects ability to attract, develop and retain staff? Who'd have thunk it!</u>, THE REGISTER (Mar. 27, 2019, 10:56 AM), https://www.theregister.co.uk/2019/03/27/dxc_cost_cutting_impacts_ability_to_attract_develop_and_retain_staff/.

282.   Clemons also revealed that the Company's employees were stuck using poorly functioning laptops due to the Company's unforgiving purchase order request procedures, admitting that "we cannot do this more poorly." As a result, according to a source quoted by *The Register*, some "employees gave up" on DXC's internal procurement department to provide equipment and were forced to "use their own PC." As a result, "DXC has no idea where confidential customer information is stored." Ultimately, Clemons acknowledged during the call that DXC's cost-cutting had hurt the Company by creating challenges in attracting, developing, and retaining talent—describing the situation as "one step forward, two back, two steps forward, one back."

283.   This frank internal admission contrasts remarkably with the Exchange Act Defendants' statements during the Relevant Period, during which they informed investors at length that their plan was "not just" cost-cutting, but instead involved serious investment by the Company, including specifically hiring the talent necessary to make the Company's growth through digital transformation.

284.   However, according to the CAC, FE-1—DXC's Chief Technology Officer for the Americas Region from April 2017 until January 2018—explained that, while DXC had given the Company a clean start, the Exchange Act Defendants quickly attained a deservedly poor reputation and could therefore only hire "B or C players" or free agents that demanded a very high price tag.

285.   Defendant Lawrie was well aware of this problem during the Relevant Period. According to the CAC, the person identified therein as FE-10 was a Vice President of Talent Acquisition at DXC from the Company's inception until November 2017. Every Thursday at 6 a.m. CT, FE-10 participated in a workforce planning call that provided updates on recruiting and strategy. Also on these calls were Defendant Lawrie and his direct reports; Kevin Jones, Senior Vice President and General Manager, Americas, the Senior Vice Presidents of various other regions, and the leaders of the Company's practice groups. During those calls, recruiting and strategy updates were provided. During one of these calls in the summer of 2017—by which time DXC had already begun firing thousands of employees—FE-10 reported on feedback that people were declining to be interviewed for DXC positions because they believed they were going to be laid off quickly if they worked there. According to FE-10, ***Lawrie and the leadership team "lost it,"*** screaming and yelling at FE-10 and

told her the issue was that her team did not know how to "tell the story" of DXC. After the call, FE-10 states, five of the leaders reached out and told her that she was right and was brave for bringing it up to Lawrie, but none of them had been willing to back her up on the call because "you don't cross Mike."

286.    Even more, while the Exchange Act Defendants repeatedly assured investors they were hiring prolifically to meet need, according to the CAC, numerous former employees revealed that the staffing shortage ultimately disclosed in November 2018 should have been no surprise to the Exchange Act Defendants.

287.    For example, during the Relevant Period, Defendant Lawrie told investors during an earnings call that DXC was "definitely attracting now some really good talent in the cyber [security] business." However, according to the CAC, the person identified therein as FE-11—a former Vice President and General Manager from DXC's inception until January 2018, who reported to Marilyn Crouther ("Crouther"), who in turn reported directly to Defendant Lawrie—stated that DXC was not hiring people fast enough to fill cyber security demand, in part because "every single decision had to be made by Mike Lawrie to hire somebody or not." Specifically, FE-11 explained, employees had to submit all requests for hiring on Tuesday in advance of a weekly Thursday meeting, in which Lawrie would make a decision—decisions which, according to FE-11, seemed to have "no rhyme or reason." FE-11 revealed that the U.S. Public Service ("USPS") segment had validated requirements in six contracts, yet they still could not get their hires approved, costing the Company to lose millions of dollars a month in revenue because they could not staff the positions. According to FE-11, this revenue loss had been an issue since DXC was formed because of Lawrie's requirement to approve all hires at DXC. FE-11 said that at one point his supervisor, Crouther, directly confronted Lawrie about the Company's losing millions of dollars a month in revenue, and also recalled incidents where his group was not believed and had to actually show the contracts to prove hiring was necessary.

288.    According to the CAC, the person identified therein as FE-12 was a Director of Security Consulting & Integration, Americas from the Company's inception until September 2018. FE-12 similarly described getting approval to hire employees as "painful," requiring multiple levels

1    of approvals until it eventually reached someone on the "L2" level, the level that reports directly to

2    Defendant Lawrie.

3        289.    According to the CAC, the person identified therein as FE-13 was a Director,

4    Americas, Enterprise and Cloud Applications from the Company's inception until February 2018.

5    FE-13 stated that Defendant Lawrie had over two thousand requests awaiting approval on his desk,

6    including requests to bring in new immediately billable employees, but that DXC simply would not

7    stock bodies. As a result of Lawrie's failure to approve the requests in a timely manner, many

8    customers walked away, describing as just one example an instance where DXC lost a $72 million

9    deal with PNC because they could not staff it.

10       290.    According to the CAC, FE-7, an Account Delivery lead, also discussed how he and

11   his peers could not get approval to hire personnel needed to do work, even when they were

12   "screaming" at management that the requested hires were for "Time and Materials" projects—

13   meaning that the Company was *losing* revenue by not hiring them. According to FE-7, the problem

14   was so severe that Defendant Lawrie was directly asked at a North Americas town hall meeting in

15   January 2019 if there was a "hiring freeze" in place. In response, Lawrie stated only that the

16   Exchange Act Defendants were "selectively hiring." FE-7 also recalled an earlier town hall meeting,

17   in 2018, when DXC's Executive Vice President and Chief Human Resources Officer, Jo Mason,

18   explicitly admitted that the Company's internal systems to find resources for projects were no good.

19       **E.    The Exchange Act Defendants Had Access to, and Knowledge of, Information**

20            **Undermining Their Projections and Revenue Guidance**

21       291.    According to the CAC, former employees have described other information known

22   by the Exchange Act Defendants—but concealed from investors—that called into question their

23   revenue projections.

24       292.    According to the CAC, the person identified therein as FE-14 was a Director at DXC

25   from the Company's inception until September 2019, and previously had been at CSC for over 20

26   years. FE-14 stated that the Company's various divisions did not complete their budgets on the

27   timeline required, causing the Company to just assign their own projections in preparing the budget.

28   However, even when those divisions finally completed their budgets—some well after the start of

the Company's fiscal year—FE-14 stated that the Company would just use the original numbers they came up with, even though they were in many instances materially higher. FE-14 described this process as "MSU"—"make shit up."

293.  According to the CAC, FE-9 corroborated this practice, including the Company's reliance on "MSU" (make shit up). FE-9 stated that, on a quarterly basis, he was involved in the preparation from the "bottom-up" a budget that included projections of revenue growth and margin for his accounts. However, when those numbers were then discussed with FE-9's superior, FE-9 was told that his numbers were no good and given new numbers from the "top-down." Even though FE-9 insisted that these numbers were not attainable, the "top-down" numbers did not change: "MSU."

294.  Further, according to the CAC, former employees have revealed that the implausibility of the revenue projections became even more apparent as the Relevant Period went on.

295.  According to the CAC, FE-14 described how, throughout his time at DXC, he prepared monthly an "Integrated Watchlist" and various documents derived therefrom, which showed the revenue for all accounts across the Company, and—among other things—calculated the delta against the Company's projected revenue. At times, FE-14 would get asked about these reports in detail with DXC Vice President Robbie Braddock, who FE-14 understood would in turn report this information up, including to former Executive Vice President Mike Nefkens prior to his departure in the Company's reorganization in January 2018. FE-14 recalled that on July 1, 2018, at the end of the first quarter fiscal year 2019, FE-14 distributed these documents, which identified a "huge" delta between the projections and the Company's current pave of revenue. Yet, the next month, Defendant Lawrie would misleadingly tell investors at DXC's annual shareholder conference that the Company's "first quarter performance *positions us well to deliver on our financial targets for fiscal 2019*."

296.  According to the CAC, the person identified therein as FE-15 was a Principal, Digital Experience Consulting, who was at the Company from July 2017 until January 2019. FE-15 stated that she and the other consultants in her offering referred to themselves as being on the "Netflix plan"—meaning they would literally just watch Netflix at their desks all day—because DXC had

backlogs of work put on hold by the customer that FE-15 estimated were 10-20 times higher than normal. The customer initiated these holds based on their concerns about DXC's delivery and service. This backlog created what FE-15 described as a "number gap," the gap between revenue targets and consultant billability. This number gap was known by DXC management: FE-15 described a meeting in September 2018, where Mike Gillis, Leader of DXC Eclipse (FE-15's offering group), stated there was a plan to close the numbers gap. In response, according to FE-15, employees all laughed because they could not see how this was possible: the Company had not had the business in the last month, and the employees could not see how DXC was going to get the numbers in the current month to make up for it, with every month having had a compounding revenue shortfall.

297.    Most remarkably, according to the CAC, **after** that meeting, a colleague told FE-15 that he was invited to join a call to come up with a plan to close the gap because the Company didn't actually have one yet.

298.    Finally, according to the CAC, FE-9 recalled personally submitting a question for Defendant Lawrie to address during a townhall meeting in or around July 2018 asking how employees could be expected to meet the Company's new revenue targets. However, FE-9 stated that Lawrie did not address this question.

## F.    The Exchange Act Defendants Classified "Digital" Offerings to Manipulate the Market

299.    According to the CAC, former employees have revealed that the Exchange Act Defendants deceptively classified their digital offerings, including particularly their "Cloud" revenue, in an effort to manipulate market perception about DXC's digital growth.

300.    According to the CAC, FE-3—a DXC Senior Finance Manager until September 2018—described how the Company would manipulate the "digital" categorization of its cost centers at whim as part of an effort to seem "cutting edge," show digital growth, and talk about how it was converting business to digital. Specifically, FE-3 participated in meetings, including some with Defendant Lawrie present, where there were "very political" decisions to re-categorize certain offerings as "digital." FE-3 participated in one meeting, in approximately December 2017, in which

1    the decision was made to re-classify certain work already done by the Consulting group as relating

2    to the Company's Cloud offering.

3        301.    Yet, Lawrie did not acknowledge this reclassification when, on February 8, 2018, he

4    bragged about the Company's Cloud performance in speaking about the Exchange Act Defendants'

5    move towards digital, stating, "We have been a little more successful than we had planned in terms

6    of offsetting the decline in the legacy infrastructure business. We've been more successful offsetting

7    that with cloud and some of our other digital offerings. So that has gone, in all candor, a little better

8    than what we had modeled and what we had communicated . . . . I mean, we're seeing 24%, 25%

9    growth in our enterprise cloud apps business."

10       302.    FE-3's account in the CAC is very similar to allegations in *Computer Sciences*

11   *Corporation v. Eric Pulier* (C.A. No. 11011-CB). There, on April 3, 2017, the Delaware Court of

12   Chancery sustained counterclaims brought in September 2016 by a former CSC executive, Eric

13   Pulier ("Pulier"), who joined CSC in 2013 when CSC—in one of Defendant Lawrie's first

14   achievements as CEO—orchestrated the purchase of Pulier's company ServiceMesh, which provided

15   enterprise cloud platform services. The purchase dramatically expanded CSC's cloud services

16   offering, which ultimately became a key point in selling the narrative to create DXC. However, Pulier

17   alleges that the sale had been fraudulently induced because CSC (including Lawrie specifically) had

18   made false assertions about "the enormous growth and profitable forecast for the coming year of

19   CSC's cloud business unit," when in fact:

20       CSC mischaracterized its cloud revenue to make its cloud program look more
         profitable to ServiceMesh and technologically capable than it really was—a practice
21       known as "cloud washing." For example, CSC counted as cloud revenue from its
         managed hosting business and revenue from managing traditional mainframe
22       computing systems. Attributing revenue from these legacy businesses to cloud
         products is inaccurate.
23

24       303.    According to the CAC, FE-7 generally corroborated that the Company's "digital"

25   classification was a "hokey game," stating: "[y]ou would not believe some of the stuff that got

26   recategorized as digital so that they could say digital growth is rising." FE-7 stated that the definition

27   of "digital" changed all the time, as the Company wanted to show improvement to analysts.

28

1

**G.      The Individual Exchange Act Defendants Had a Motive to Commit Fraud**

2      304.    In addition to the facts alleged herein,[14] additional facts give rise to the strong

3 inference that, throughout the Relevant Period, the Exchange Act Defendants knew or recklessly

4 disregarded that their statements and omissions, as set forth in Section VIII, were materially false

5 and misleading when made.

6      305.    Specifically, the Individual Exchange Act Defendants were motivated to artificially

7 inflate the price of DXC's stock so that they could maximize the sales of substantial amounts of their

8 personal holdings. The Individual Exchange Act Defendants' transactions during the eight months

9 prior to the October 2018 revelation were made at times and amounts that were highly suspicious

10 and unusual.

11      306.    The charts below list the Individual Exchange Act Defendants' sales during the eight-

12 month period:

13      **Sales by Defendant Lawrie**                          **Sales by Defendant Saleh**

| Trade Date | Shares Sold | Gross Proceeds |
|---|---|---|
| 03/28/18 | 100 | $10,202 |
| 04/10/18 | 7,400 | $757,101 |
| 04/11/18 | 2,500 | $256,188 |
| 04/26/18 | 2,500 | $257,899 |
| 04/27/18 | 2,500 | $257,297 |
| 05/08/18 | 2,500 | $256,042 |
| 05/09/18 | 2,500 | $257,348 |
| 08/28/18 | 55,549 | $4,989,600 |
| 09/13/18 | 30,000 | $2,771,163 |
| 09/27/18 | 2,500 | $235,373 |
| 09/28/18 | 2,500 | $234,127 |
| **Total** | **110,549** | **$10,282,340** |

| Trade Date | Shares Sold | Gross Proceeds |
|---|---|---|
| 08/08/18 | 19,285 | $1,735,650 |
| 08/24/18 | 5,715 | $514,476 |
| 09/07/18 | 25,678 | $2,340,806 |
| 09/11/18 | 4,322 | $389,066 |
| 09/13/18 | 50,000 | $4,601,385 |
| **Total** | **105,000** | **$9,581,383** |

23      307.    The timing of DXC stock sales by the Individual Exchange Act Defendants was

24 highly suspicious and unusual. Moreover, the Individual Exchange Act Defendants' stock sales

25

26

27 ────────────────
[14] The cumulative knowledge of all members of the Company's management team, including the
28 Individual Defendants, is properly imputed to DXC.

represented meaningful decreases in Defendants' overall holdings, and these sales were not offset by personal acquisitions of DXC stock.

308. At the start of the eight-month period prior to the October 2018 corrective disclosure, Defendant Lawrie held 646,110 shares of DXC common stock. He had net sales of 110,549 shares during that period, representing a decrease of ***more than 17% of his holdings***.

309. Likewise, Defendant Saleh held 136,289 shares of DXC stock at the start of the eight-month period. He sold 105,000 shares during that period, including the RSUs awarded to Defendant Saleh during that time, representing a decrease of approximately 77% of his holdings.

310. The timing of these sales is also suspicious. All of the Individual Exchange Act Defendants' sales occurred before the first corrective disclosure in *The Register* on October 24, 2018, which caused the Company's stock price to decline. Indeed, the vast majority of these sales occurred just weeks earlier, in August and September 2018, just before Lawrie "blamed Puri for a 10 to 15 per cent shortfall in [forecast] revenues" in a nonpublic meeting at DXC.

311. Considered collectively, the Individual Exchange Act Defendants' DXC stock sales support an inference of scienter because: (i) Defendant Lawrie sold no stock until the eight-month period before the October 2018 corrective disclosure and then sold over $10 million worth of shares (excluding an exercise) during the Class Period; (ii) the quantity of shares sold by Defendants Lawrie and Saleh represented a significant percentage of the Individual Defendants' overall total holdings; and (iii) many of these sales were timed to capitalize on DXC's inflated stock price before Defendants' fraud first became partially known to investors.

312. The enormous personal benefits that Defendants Lawrie and Saleh received through their insider sales were in addition to other significant compensation they received. Indeed, Hilton, who as noted above was a senior executive with the Company, has alleged in the Hilton Complaint that Defendant Lawrie controlled DXC's Compensation Committee, which acted "as a rubber stamp for Lawrie." According to Hilton, the Compensation Committee exercised no meaningful independent oversight of Lawrie. This is evidenced by, among other things, the awards of $5 million and $1.584 million in incentive awards in June 2018, at a time when Hilton—the head of Global Delivery—was not approved for a single dollar.

## XI.   PRESUMPTION OF RELIANCE

313.   At all relevant times, the market for DXC stock was an efficient market for the following reasons, among others:

(a)   DXC stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)   DXC stock traded at high weekly volumes;

(c)   As a regulated issuer, DXC filed periodic public reports with the SEC and the NYSE;

(d)   DXC was eligible to, and did, file registration statements with the SEC on Form S-3;

(e)   DXC regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(f)   DXC was followed by several securities analysts employed by major brokerage firms, including Barclays, BMO Capital Markets, Cantor Fitzgerald, CFRA, Cowen, Deutsche Bank, Evercore, Jefferies, J.P. Morgan, Morgan Stanley, RBC Capital Markets, Sadif Investment Analytics, Susquehanna Financial Group, SunTrust Robinson Humphrey, and Wells Fargo. Each of these reports was publicly available and entered the public marketplace.

314.   As a result of the foregoing, the market for DXC stock promptly digested current information regarding DXC from all publicly available sources and reflected such information in the price of DXC common stock

315.   A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated on Defendants' omissions of material fact that there was a duty to disclose.

## XII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

316.   The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

317.   Alternatively, to the extent that the statutory safe harbor otherwise would apply to any of the allegedly false or misleading forward-looking statements, the Exchange Act Defendants are liable for those statements because, at the time each of these statements was made, the speaker knew the statement was false or misleading and the statement was authorized or approved by an executive officer, director, or other control person of DXC who knew that the statement was false. These and similar arguably forward-looking statements cannot be protected under the PSLRA safe harbor.

## XIII.   CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

### <u>COUNT III</u>

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(Against the Exchange Act Defendants)**

318.   Plaintiffs repeat and reallege the allegations set forth in ¶¶ 128-214 above as if fully set forth herein.

319.   During the Relevant Period, the Exchange Act Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Relevant Period, did: (i) deceive the investing public, including Plaintiffs, as alleged herein; and (ii) cause economic harm to Plaintiffs.

320.   The Exchange Act Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business

1    which operated as a fraud and deceit upon the purchasers of the Company's stock, including

2    Plaintiffs, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

3    321.    The Exchange Act Defendants, individually and in concert, directly and indirectly, by

4    the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and

5    participated in a continuous course of conduct to conceal adverse material information about the

6    Company's financial well-being, operations, and prospects.

7    322.    During the Relevant Period, the Exchange Act Defendants made the false statements

8    specified in ¶¶ 128-214 above, which they knew or recklessly disregarded to be false or misleading

9    in that they contained misrepresentations and failed to disclose material facts necessary in order to

10   make the statements made, in light of the circumstances under which they were made, not misleading.

11   323.    The Exchange Act Defendants had actual knowledge of the misrepresentations and

12   omissions of material facts set forth in ¶¶ 128-214 herein, or recklessly disregarded the true facts that

13   were available to them. The Exchange Act Defendants engaged in this misconduct to conceal DXC's

14   true condition from the investing public and to support the artificially inflated prices of the

15   Company's stock.

16   324.    Plaintiffs have suffered damages in that, in reliance on the false or misleading

17   statements alleged herein, and/or the integrity of the market, they purchased or otherwise acquired

18   DXC stock at prices that were artificially inflated as a result of the Exchange Act Defendants'

19   misconduct and were harmed when the truth about DXC negatively impacted the price of those

20   securities. Plaintiffs would not have purchased or otherwise acquired DXC stock at the prices they

21   paid, or at all, had they been aware of the truth about DXC.

22   325.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct,

23   Plaintiffs suffered harm in connection with their purchases and acquisitions of the Company's stock

24   during the Relevant Period.

25   326.    By virtue of the foregoing, the Exchange Act Defendants violated Section 10(b) of

26   the Exchange Act and Rule 10b-5 promulgated thereunder.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT IV

### For Violations of Section 20(a) of the Exchange Act and Rule 10b-5

### (Against the Individual Exchange Act Defendants)

327.    Plaintiffs repeat, incorporate, and reallege the allegations set forth in ¶¶ 128-214 above as if fully set forth herein.

328.    The Individual Exchange Act Defendants acted as controlling persons of DXC within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in, and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about DXC, the Individual Exchange Act Defendants had the power and ability to control the actions of DXC and its employees.

329.    By reason of such conduct, the Individual Exchange Act Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**XIV.    PRAYER FOR RELIEF**

330.    Plaintiffs demand judgment against Defendants as follows:

(a)    requiring Defendants to pay damages sustained by Plaintiffs by reason of the acts and transactions alleged herein;

(b)    awarding Plaintiffs prejudgment and post-judgment interest, as well as their reasonable counsel fees and expert fees, and other costs and expenses reasonably incurred by this action; and

(c)    awarding such other relief as the Court may deem just and proper.

**XV.    JURY DEMAND**

331.    Plaintiffs hereby demand a trial by jury.

DATED: March 31, 2020

By: */s/ Robert J. Gralewski, Jr.*

**KIRBY McINERNEY LLP**
Robert J. Gralewski, Jr. (#196410)
600 B Street, Suite 2110
San Diego, California 92101

1

Telephone: (619) 784-1442
Email: bgrawleski@kmllp.com

Ira M. Press
Daniel Hume
Thomas W. Elrod
Meghan J. Summers
250 Park Avenue, Suite 820
New York, New York 10117
Telephone: (212) 371-6600
Email: ipress@kmllp.com
        dhume@kmllp.com
        telrod@kmllp.com
        msummers@kmllp.com

*Attorneys for Plaintiffs*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28